UNITED STATES, Appellee

v.

HERBERT F. JEWSON, Jr., Lieutenant Colonel,
U. S. Army, Appellant

1 USCMA 652, 5 CMR 80

No. 532

Decided August 29, 1952

LT. COL. James C. Hamilton, USA, for Appellant.
LT. COL. Thayer Chapman, USA, and 1ST LT. Richard L. Brown, USA, for Appellee.

PAUL W. BROSMAN, Judge:

This unfortunate case is the product of the following series of events. The commissioned officers and higher-ranking enlisted personnel of the 235th Field Artillery Observation Battalion, a National Guard unit called into Federal service and stationed at Camp McCoy, Wisconsin, planned a stag party. Appellant was the commanding officer of the unit. Included within the plans was the showing of a pornographic motion picture. An enlisted man, who had access to such items, was detailed to secure the motion picture film. He did so, and at the agreed date and time the officers and men gathered for the battalion party.

In the meantime, the commanding officer of Camp McCoy, a Colonel Bullard, received unofficial notice of the plans for the social event, including the film showing. There was a distressing background of friction between appellant's National Guard unit and the regular complement of Camp McCoy. On the night scheduled for the party, Colonel Bullard, together with three of his subordinate officers, secreted themselves in a building adjoining that in which the film showing was to take place. When the lights were extinguished, indicating that the film was under way, they burst into the hall, switched on the lights, and ordered the showing halted. Colonel Bullard thereupon relieved appellant Jewson of command, and directed that the unit's executive officer, a Major Stewart, who was not then present, be summoned to assume command. Major Stewart was called from his home by telephone and immediately took command of the battalion. Colonel Bullard thereafter ordered an investigation which culminated in these charges, in a trial by general court-martial, and in the findings of guilt with which we are now concerned.

Appellant has been convicted under two specifications alleging conduct unbecoming an officer and a gentleman, in violation of Article of War 95, 10 USC § 1567. Specifically it was charged: (1) That wrongfully and knowingly he permitted, and assisted at, the showing of a lewd and obscene motion picture. (2) That wrongfully, and with intent to deceive, he made statements under oath to the effect that he had no prior knowledge of the nature of the film to be shown on the evening in question. These same allegations were made the basis of two further specifications of conduct prejudicial to good order and military discipline, in violation of Article of War 96, 10 USC § 1568. Guilty findings were returned under these specifications as well. Other specifications of which the accused was found not guilty need not be related here. Appellant was sentenced to dismissal. A board of review in the office of The Judge Advocate General, United States Army, affirmed the findings and sentence.

This Court granted petition for review, limited, however, to the following issues: (1) Whether there was "permissive entrapment" of the accused. (2) Whether the convening authority was in fact the accuser. (3) Whether the introduction in evidence of Court Exhibit 1 was prejudicial error. We shall treat these issues in the order stated.

## II

"Permissive entrapment" is acknowledged by appellate defense counsel to be a novel theory "with no precedents in civilian law and practically none in military law." Its essence is said to consist in leadership—that quality and that duty demanded of every service officer. Succinctly stated, it seems to amount to this. An officer, who is aware that a member of his command proposes to commit an offense, is required, in the exercise of his function of leadership, to stop the potential offender short of his prospective crime. Failure to do this is said to constitute a failure of leadership, which becomes available as a defense to the offender who has carried his unlawful plan into operation.

We hesitate to subscribe to such a theory. Reason does not commend it. Were it to be adopted, a further step would be to elevate to defense status,

**655**

not only what an accused's superior officers knew, but what they should have known, as well. The end result of this would be, we are much afraid, that many court-martial proceedings would become trials of the competency of the accused's superiors, and not of the accused himself. Appellant has culled his theory from three Army board of review decisions: United States v. Line, 1 BR 25; United States v. Fay, 8 BR 365; United States v. Reyes, 74 BR 203. Taken out of context, there is certainly language in these cases which lends credence to appellant's position. However, read in their true light, we think they fall short of developing the principle he ascribes to them. In any event, we decline to read into military law the doctrine of "permissive entrapment" urged upon us.

Stated simply, the defense of entrapment has been available historically only to one who has been induced to commit a crime which he would not otherwise have committed—that is, where the proposal to commit the crime originated with the arresting officers. United States v. Wray, 8 F2d 429, 430; Swallum v. United States, 39 F2d 390, 393 (CA8th Cir); Ratigan v. United States, 88 F2d 919, 922 (CA 9th Cir); Morei v. United States, 127 F2d 827, 833, 835 (CA6th Cir); United States v. Lindenfeld, 142 F2d 829, 831 (CA2d Cir); United States v. Abdallah, 149 F2d 219, 222 (CA2d Cir); Kott v. United States, 163 F2d 984, 987 (CA 5th Cir); Stein v. United States, 166 F 2d 851, 853 (CA9th Cir); United States v. Stephan, 50 F Supp 445, 448. Setting the stage to discover the guilt of one who has conceived his own wrongful plan does not violate the rule against entrapment. Price v. United States, 56 F2d 135, 136 (CA7th Cir); Louie Hung v. United States, 111 F2d 325 (CA9th Cir); Hayes v. United States, 112 F2d 676, 677 (CA10th Cir); Farber v. United States, 114 F2d 5, 10 (CA9th Cir). This is actually what happened here. We leave the law of the subject as we find it.

### III

Likewise without merit is appellant's

contention that the convening authority was in fact the accuser in contravention of Article of War 8, 10 USC § 1479. The Commanding General, Fifth Army, the convening authority here, directed one Colonel Edwards to investigate the military organization commanded by appellant. That officer, after his investigation, submitted his report and recommendations to the appointing general. Thereafter, a Major Bowen, an assistant staff judge advocate in Fifth Army headquarters, signed as accuser the charges and specifications upon which appellant was tried and convicted. Appellant's argument is that since Major Bowen, the accuser, had made no personal investigation, he could only have secured his information from reports sent to him by his commanding general. Appellant concludes that, therefore, Major Bowen was only nominally the accuser for the commanding general, who was the accuser in fact.

The Government argues, on the other hand, that the Commanding General, Fifth Army, was acting solely in his official capacity, and cannot be regarded as an accuser within Article of War 8. In his Military Law and Precedents, 2d ed, 1920 Reprint, Winthrop says, at page 62:

"... where, upon the facts of the supposed offence being reported to him, and appearing to call for investigation by court-martial, he has, as commander, directed some proper officer, as the commander of the regiment or company of the accused, or his own staff judge advocate, to prepare the charges, (indicating or not their form,) or has approved or revised charges already prepared, he is not to be regarded as an 'accuser' in the sense of the Article, his action having been official and in the strict line of his duty. ..."

Appellant concedes this to be the law, but contends that here the commanding general was not, in fact, acting solely in his official capacity. To buttress his position in this purely factual issue, he relies on United States v. Gordon (No. 258), 1 USCMA 255, 2 CMR 161, decided March 19, 1952. Although that case bears on the issue, it is hard-

ly authority in appellant's favor. There, one of the charges against the accused was an attempted burglary of the quarters of the convening authority. Although the accused in that case was not brought to trial for the attempted offense against the convening authority's property, there was a definite *personal* link between them, which precluded the latter from acting in the case. In the Gordon case we stated the test to be "whether the appointing authority was so closely connected to the offense that a reasonable person would conclude that he had a personal interest in the matter." Applying that test here, we can reach no other conclusion than that a reasonable person could not believe that the convening authority's interest in appellant's case was anything but official. To follow appellant here would be to extend the rationale of the Gordon case considerably beyond the "limits of its logic."

## IV

The remaining issue is whether the introduction into evidence of Court Exhibit 1 was prejudicial error. The exhibit in question is a carbon copy of a transcript of a recording of an interview between an investigating officer and appellant, duly certified by the investigating officer to be a true copy. Appellant contends that its admission into evidence violates both the so-called "best evidence" rule and the hearsay rule.

The hearsay rule aspect of the matter may be disposed of in short order. The exhibit was admitted solely for the purpose of *impeachment* of appellant, who was then being cross-examined. It was not admitted for the purpose of establishing the truth of any of the statements contained in it. This being the case, there can be no hearsay problem, because there was no hearsay use of the writing. Murray v. United States, 10 F2d 409, 411 (CA7th Cir.), cert den, 271 US 673, 70 L ed 1144, 46 S Ct 486; State v. Morgan, 142 La 755, 77 So 588; Commonwealth v. Feci, 235 Mass 562, 127 NE 602. This principle is specifically set out in the Manual: "The fact that a given statement was or was not

made may itself be relevant. In such a case a witness may testify that the statement was made—not for the purpose of proving the truth of what was stated but for the purpose of proving the fact that it was stated." Manual for Courts-Martial, US Army, 1949, paragraph 126a; Cf. Manual for Courts-Martial, United States, 1951, paragraph 139a.

To understand the part the "best evidence" rule may play in this problem it is first necessary to isolate precisely what the proponent was seeking to establish. Here, the object of proof was a certain series of questions and answers during an investigatory interrogation of appellant. On the face of it, this problem does not involve the "best evidence" rule. Time was when the rule applied to all classes of evidence, and was said to require in each instance the very best evidence of which the nature of the case would admit. Expressed in such a vague generalization, it was difficult of application. However, as understood today, the rule applies only when it is sought to prove the contents of a writing. Michigan Bankers' Ass'n. v. Ocean Accident & Guar. Corp., 274 Mich 470, 264 NW 868; Perry v. Ryback, 302 Pa 559, 153 A 770; Wigmore, Evidence, 3d ed, § 1180; Thayer, Preliminary Treatise on Evidence, 484–507. It requires production of the writing itself, unless good and sufficient reasons are shown for its nonproduction—in which case proper "secondary" evidence may be admitted. Mahaney v. Carr, 175 NY 454, 461, 67 NE 903; Butler v. Mail and Express Pub. Co., 171 NY 208, 211, 63 NE 951.

This view of the rule appears in the Manual itself, where, in paragraph 129a pertaining to proof of contents of a writing, it states: "A writing is the best evidence of its own contents and must be introduced to prove its contents. Under this rule, *known as the best evidence rule,* if it is desired to prove the contents of a private letter or other unofficial paper or of an official paper . . . the strict and formal method of doing so is to call a witness who can authenticate (identify as

genuine) the document, and then to introduce the original in evidence." [Emphasis supplied.] Manual for Courts-Martial, US Army, 1949, paragraph 129a; cf. Manual for Courts-Martial, United States, 1951, paragraph 143a(1). The present practice is entirely consistent with the rationale behind the rule—that is, the notion that requiring production of the writing itself eliminates possibility of mistakes, willful or otherwise.

Now, as noted, the problem here was one of proof of certain questions and answers. They could certainly be established by any person who was present during the interrogation. In addition, the mechanical recording made at the time of the examination could, after having been duly identified and authenticated, have been introduced in evidence and reproduced in sound for the members of the court. Commonwealth v. Clark, 123 Pa Super 277, 187 A 237; State v. Minneapolis Milk Co., 124 Minn 34, 144 NW 417; Boyne City, G. & A. R. Co. v. Anderson, 146 Mich 328, 109 NW 429; see also Commonwealth v. Roller, 100 Pa Super 125. However, the prosecution here introduced, not the recording itself, but a duly authenticated typewritten transcript thereof. It would be an anomalous rule, indeed, which would admit the recording but exclude an authenticated transcript of its contents. The net effect of each is precisely the same, the only difference in detail being that, in the case of the recording, its message is conveyed to court members through their auditory sense while the transcript reaches them through their visual faculty.

This view presupposes, of course, that a proper foundation be laid for receipt of the transcript. It must be identified positively by one informationally equipped to do so, as a true transcript of the recording in question. Ordinarily this identification will come from either the stenographer who made the transcript, or from the person who directed its preparation, and who knows, from familiarity with the recording, that it constitutes an accurate tran-
658

scription. Here the stenographer was not produced. However, the officer who had conducted the interrogation and made the recording, and who had directed its typewritten transcription, was called as a witness. He testified explicitly that the transcript had been made from the recording in question at his direction and that, after examination, he had determined that it was accurate. It is true that he did not so testify at the time the transcript was actually received in evidence. However, he had earlier done so fully and with definiteness when it had been accepted for identification as Court Exhibit 1. It is to be observed that the document under scrutiny here was a court exhibit, and not one offered by the Government or the defense. Generally speaking, the better practice would be to have the proper foundation laid by the party making the offer in evidence in specific conjunction with that offer. But here the record clearly and specifically reveals that the foundation had been laid. The fact that it was not laid at a time we might think preferable cannot be fatal.

We note also the total absence of objection by the defense in connection with the necessity for a foundation for admission of the transcript. Although the burden of establishing the foundation rests on the element of the tribunal proposing the evidence, absence of objection will normally be construed as a waiver.

In holding as we do that the transcript was not improperly received in evidence, we are aware that it would be excluded in some civilian jurisdictions. Historically, courts have been hostile—unreasonably so, we believe—to the admission of written recordings of testimony or conversations. The rationale has been that such transcriptions are unreliable. The rule has even gone so far as to exclude, at a second trial, typewritten records of testimony at an earlier one, produced by a court stenographer from shorthand notes of the earlier proceeding. The irrationality of the rule in that context has been expressly abrogated by statute in many

states and by rule in the Federal area. Wigmore, Evidence, 3d ed, § 1669; Rule 80(c), Federal Rules of Civil Procedure.

We regard the rule as no more rational when applied to any adequately authenticated transcript, such as that involved here. No Federal cases on all fours with the present one have been brought to our attention. But cf. Wattenmaker v. United States, 34 F2d 741 (CA3d Cir); Johnson v. Umsted, 64 F 2d 316 (CA8th Cir). However, were they to be presented to us, and were they to hold contrary to the view we take, we would be required respectfully to decline to follow them as inappropriate in the military justice scene. The exigencies of the service imperatively require extensive resort to recordings of interviews held in the field, and to subsequent typewritten transcriptions made at the interviewing officer's headquarters. Moreover, common sense dictates the propriety and entire safety of the use of such transcriptions in evidence. We experience no qualms in announcing for the military a rule sanctioning their admission.

Proving such a transcript, because it involves the problem of establishing the contents of a writing, would appear to bring the "best evidence" rule into play. This would normally require production of the original typewritten transcript. It was not the original, however, but a duly certified true carbon copy thereof, which was offered in evidence by the prosecution and received by the court here. That, we conceive, is within an exception to the "best evidence" rule explicitly embodied in the Manual provision that "a carbon copy of a document, as complete as the original in all essential respects, including relevant signatures, if any . . . is considered to be a duplicate original and, as such, equally admissible as an original." Manual for Courts-Martial,

U. S. Army, 1949, paragraph 129a; cf. Manual for Courts-Martial, United States, 1951, paragraph 143a(1). This exception is not unique in military law. International Harvester Co. v. Elfstrom, 101 Minn 263, 112 NW 252; People v. Hauke, 335 Ill 217, 167 NE 1; State v. Keife, 165 La 47, 115 So 363; Taylor v. Commonwealth, 117 Va 909, 85 SE 499. The copy introduced here was "as complete as the original in all essential respects, including relevant signatures, if any." Although appellant had not signed the copy admitted in evidence, we note also that he had not signed the original.

There is an additional reason why the carbon copy of the original transcript could have come in, even though not considered a duplicate original, but only as "secondary" evidence. The object of its admission was the impeachment by self-contradiction of the appellant in a very small portion of his testimony. That matter was entirely collateral to the main issues of the trial. In such a situation the "best evidence" rule is generally held inapplicable and secondary evidence admissible. Sharfsin v. United States, 265 F 916 (CA4th Cir); O'Shea v. United States, 93 F2d 169 (CA6th Cir); State v. Winstead, 204 La 366, 15 So2d 793; State v. Roberson, 215 NC 784, 3 SE2d 277.

Holding, as we do, that there was no error in admission of Court Exhibit 1, the third issue specified is disposed of.

Accordingly, the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

Under a recently enacted rule of this Court a judge who is not present at oral arguments of the case is not permitted to participate in the decision. Judge Latimer was in the hospital at the time of argument and his views are therefore not expressed.