IN THE CASE OF


UNITED STATES, Appellee

v.

Rodney CRAIG, Specialist
U.S. Army, Appellant

No. 03-0321

Crim. App. No. 9900815

United States Court of Appeals for the Armed Forces

Argued December 10, 2003

Decided August 3, 2004

GIERKE, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., EFFRON, BAKER, and ERDMANN, JJ., joined.

Counsel

For Appellant:  Captain Gregory M. Kelch (argued); Colonel
Robert D. Teetsel, Lieutenant Colonel Mark Tellitocci, and Major
Allyson G. Lambert (on brief); Lieutenant Colonel E. Allen
Chandler, Jr. and Major Imogene M. Jamison.

For Appellee:  Captain Timothy D. Litka (argued); Colonel Lauren
B. Leeker, Lieutenant Colonel Margaret B. Baines, and Major
Theresa A. Gallagher (on brief); Captain Tami L. Dillahunt.




Military Judge:  T. E. Dixon




**This opinion is subject to editorial correction before final publication**.

Judge GIERKE delivered the opinion of the Court.

Appellant was involved in a drug distribution scheme.  A law enforcement agent recorded a telephone conversation in which Appellant made inculpatory statements to one of his co-conspirators.  At trial, because of the recording's poor quality, the military judge allowed the Government to give the members a transcript of the conversation.  This appeal concerns whether the military judge properly admitted that transcript.  We conclude that the military judge did not abuse his discretion when he permitted the members to receive a substantially accurate transcript of the poor-quality recording.

## Background

Appellant faced trial for two specifications of conspiracy to possess and distribute marijuana and one specification of possessing marijuana in violation of Articles 81 and 112a of the Uniform Code of Military Justice.[1]  The members found him guilty of one specification of conspiring to possess and distribute marijuana and not guilty of the remaining two specifications.  The members sentenced Appellant to confinement for two years, a bad-conduct discharge, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade.  The convening authority approved the sentence as adjudged.  The Army Court of Criminal

---

[1] 10 U.S.C. §§ 881, 912a (2000).

Appeals summarily affirmed the findings and sentence and we granted review.

## Facts

Appellant was charged with involvement in two separate conspiracies to possess and distribute drugs. The first — of which he was acquitted — allegedly occurred on February 13, 1999. Private First Class (PFC) Roderick G. Pearsall testified that Appellant asked him to accompany Appellant on a trip from Fort Hood to El Paso, Texas, to "pick up marijuana." PFC Pearsall agreed to do so for $200. When the two arrived in El Paso, they met Appellant's connection, who went by the name of "Bam." Once Appellant obtained marijuana from Bam, he and PFC Pearsall drove back to Fort Hood, where Appellant left PFC Pearsall before continuing to Louisiana with the marijuana.

The second conspiracy — of which Appellant was convicted — began on March 25, 1999. Appellant was in an extra-duty status, making it difficult for him to go on the 1,200-mile round trip between Fort Hood and El Paso. So he asked PFC Pearsall to travel to El Paso on his behalf to pick up more marijuana from Bam. PFC Pearsall agreed and asked PFC Demetrius A. Austin to go with him. That night, the two soldiers drove to El Paso in PFC Austin's car, arriving there the next morning. Once in El Paso, PFC Pearsall called Appellant, who gave him Bam's pager number. After PFC Pearsall and Bam made an initial telephone

contact, Bam met the two soldiers who followed him to a house and waited outside. When Bam left the house and returned to PFC Austin's car, he put two duffel bags in the trunk.

During their return trip to Fort Hood, the two soldiers were stopped at an immigration checkpoint in Sierra Blanca, Texas. After PFC Austin consented to a search of his car, border patrol agents found approximately 51 pounds of marijuana in the two duffel bags in his trunk. The border patrol agents arrested the two soldiers and notified the Drug Enforcement Agency (DEA). During each of their separate interrogations, the two soldiers implicated Appellant in the drug-running scheme. After being denied permission to arrange a controlled delivery of the marijuana to Appellant, DEA Agent Rene R. Perez decided to have PFC Pearsall make a recorded telephone call to Appellant to confirm his involvement. PFC Pearsall then made two telephone calls to Appellant, during which PFC Pearsall told Appellant that PFC Austin's car had broken down during their return to Fort Hood.

The first conversation lasted approximately five minutes. During this conversation, PFC Pearsall asked, "So you just want me to bring the herb to your house?" Appellant replied, "Yeah." The second conversation lasted approximately three minutes. During this conversation, PFC Pearsall asked Appellant, "[W]hat are we hauling anyway?" Appellant replied, "I guess it's weed.

4

It's supposed to be weed." Appellant then estimated that the two bags contained forty pounds of marijuana.

At Appellant's trial, the Government's first witness was DEA Agent Perez. His testimony established that Prosecution Exhibit 13 was the microcassette tape on which he recorded the conversations. The Government then called PFC Pearsall, whose testimony included a description of his telephone conversations with Appellant and the method by which they were taped. During PFC Pearsall's testimony, the military judge called an Article 39(a)[2] session at which he admitted the tape into evidence over defense objection. After the members returned to the courtroom, the trial counsel began to play the tape. At some point, the military judge directed the trial counsel to stop the tape and stated, "The court's having difficulty understanding the tape." When the military judge asked whether the members could understand the tape, the president replied, "Only partially." The military judge then called a recess to allow the Government to obtain a better sound system over which to play the tape. During the recess, a member of the legal office's staff who was attempting to help accidentally recorded over a portion of the second telephone conversation.

Another Article 39(a) session followed the recess, during which the military judge commented, "The court cannot understand

---

[2] Uniform Code of Military Justice, 10 U.S.C. § 839(a) (2000).

the tape, it's not audible, and although it's been admitted at this point in time I've determined that it would lead to confusion of the members and would otherwise be unhelpful . . . ."  The military judge concluded, "[T]herefore, I'm not going to allow you to play the tape at this point in time.  So to the extent that the defense has objected to the tape, I'm going to sustain that objection based on that rationale."  The military judge and the parties nevertheless continued to refer to the tape as Prosecution Exhibit 13 and continued to treat it as evidence that had been admitted, indicating that the military judge intended to sustain an objection to playing the tape in open court rather than to the tape's admissibility.

During this Article 39(a) session, the trial counsel also offered a transcript of the tape for admission into evidence.  At the military judge's request, the trial counsel again played the tape.  After the defense objected to the transcript's admissibility, the military judge declared another recess during which he listened to the tape and reviewed the transcript.  Following the recess, the military judge ruled that the Government had not presented an adequate foundation for the transcript's admissibility.  But the military judge allowed the trial counsel to try to lay a proper foundation for the transcript's admission.

The Government then called to the stand the court reporter who prepared the transcript. She testified that she listened to the tape over headphones, which helped her to understand the recorded conversation. She also testified that the transcript she prepared was a fair and accurate account of the tape. Over defense objection, the military judge admitted the transcript into evidence. He ruled that the transcript "would be helpful to" the members "in understanding the tape." He then asked the defense counsel to propose a limiting instruction and declared a recess. The record does not expressly indicate whether the defense counsel drafted such an instruction. But following the recess, the military judge gave the members a limiting instruction without defense objection. This instruction stated that the transcript was "prepared to assist, if at all, in your understanding of the content of the tape. The content of the tape is the evidence. The transcript is a tool that the court has admitted for the limited purpose in assisting you to understand the tape." The military judge also cautioned the members that the transcript "is not a substitute for the tape." The military judge then instructed the members to "consider the clarity of the tape in determining what the weight is that you will give to the tape." He concluded by advising the members that "the tape has been recorded over in at least one place" and

telling them to "take that into account in determining what weight to give the tape."

PFC Pearsall then returned to the stand. The trial counsel gave each member a copy of the transcript and then played the entire tape. PFC Pearsall testified that with the exception of the short erasure, the tape was an accurate account of his conversations with Appellant. He then identified the voices — which the transcript simply labels "V1" and "V2" — as Appellant's and his. Following the direct examination, the trial counsel collected the copies of the transcript from the members.

The Government later called to the stand a squad leader from Appellant's company who knew both Appellant and PFC Pearsall. The trial counsel then played approximately thirty to forty-five seconds of the tape. She asked the witness if he was able to hear the tape. He replied, "Yes I was." She asked, "[C]ould you understand the voices that you heard?" He replied, "Yes I do." He then identified the voices as belonging to Appellant and PFC Pearsall.

The Government's case in chief also included testimony from an Army Criminal Investigation Command (CID) agent who interrogated Appellant. The agent testified that Appellant initially denied any involvement with or knowledge of PFC Pearsall's and PFC Austin's trip to El Paso. But when

8

confronted with information about the recorded telephone calls, Appellant admitted that either PFC Pearsall or PFC Austin had called him. The CID agent also testified that Appellant admitted that he had transported drugs from El Paso to Baton Rouge, Louisiana, and identified his El Paso drug connection as Bam. The Government also presented testimony from PFC Pearsall's sister that Appellant repeatedly called her and admitted that he had asked PFC Pearsall to go to El Paso on his behalf. The Government's final witness was PFC Austin, who also testified about Appellant's involvement in the drug distribution scheme and the recorded telephone calls between PFC Pearsall and Appellant.

Appellant took the stand during the defense's case in chief. In addition to denying any involvement in drug distribution, he testified that the Government had earlier produced a different version of the transcript of the telephone conversations identifying him and PFC Pearsall as the two speakers. He also alleged that different versions of the audiotapes existed and that the version played in court was different from those he previously heard. In response to a government objection that Appellant was mischaracterizing the evidence, the military judge told the members that the transcript of the tape would be returned to them and "[y]ou will make your own assessment of the tape and the transcript."

When the members retired to deliberate, the military judge provided them with all of the admitted exhibits, including the transcript and the tape, as well as a tape recorder on which to play the tape. The members then deliberated for approximately one-and-a-half hours and found Appellant not guilty of the two specifications alleging his involvement in the first trip to El Paso, but guilty of conspiring with PFC Pearsall and PFC Austin in connection with their trip to El Paso.

## Discussion

During its first term, our Court addressed the admissibility of a transcript of an audio recording. Our opinion in United States v. Jewson noted, "Historically, courts have been hostile — unreasonably so, we believe — to the admission of written recordings of testimony or conversations."[3] We stated that it would be irrational to exclude an "adequately authenticated transcript."[4] In our view, such exclusion is particularly "inappropriate in the military justice scene," where "exigencies of the service imperatively require extensive resort to recordings of interviews held in the field, and to subsequent typewritten transcriptions made at the interviewing

---

[3] United States v. Jewson, 1 C.M.A. 652, 658, 5 C.M.R. 80, 86 (1952).

[4] Id. at 659, 5 C.M.R. at 87.

officer's headquarters."[5]  The Court observed that "common sense dictates the propriety and entire safety of the use of such transcriptions in evidence."[6]

We continue to believe that, subject to foundational requirements and appropriate procedural safeguards, a transcript of an audio recording may be used at courts-martial.

As the United States Court of Appeals for the Ninth Circuit observed in its 1975 United States v. Turner opinion, "It is well recognized that accurate typewritten transcripts of sound recordings, used contemporaneously with the introduction of the recordings into evidence, are admissible to assist the jury in following the recordings while they are being played."[7]  We agree with the Ninth Circuit's guidance that the "admission of such transcripts as an aid in listening to tape recordings, like the use of photographs, drawings, maps, and mechanical models which assist understanding, is a matter committed to the sound discretion of the trial court."[8]

---

[5]  Id.

[6]  Id.

[7]  United States v. Turner, 528 F.2d 143, 167 (9th Cir. 1975). Accord United States v. Young, 105 F.3d 1, 10 (1st Cir. 1997) ("In this circuit we have long approved the use of properly authenticated transcripts of tape recordings for the purpose of helping the jury listen to and understand the recordings themselves.").

[8]  Turner, 528 F.2d at 167 (citation omitted).

In our 1992 decision in United States v. Banks, we provided guidance to trial judges dealing with audiovisual evidence.[9] We encouraged the use of transcripts "as an aid in presenting evidence with audio dialogue" and suggested that "the military judge indicate if he or she has viewed or listened to the proffered evidence prior to ruling on its admissibility."[10] We also noted that when such a tape's "audio is poor, a transcript could assist both the trier of fact and appellate courts."[11] The admission of the transcript in this case was consistent with Jewson, Turner, and Banks.

The military judge properly admitted the tape itself. We generally agree with the Ohio Supreme Court that, once a proper foundation is laid, "recorded tapes of actual events, such as street drug sales, should be admissible despite audibility problems, background noises, or the lack of crystal clear conversations, since they directly portray what happened."[12] However, this rule is subject to the caveat that a recording is not admissible if "the unintelligible portions are so substantial as to render the recording as a whole

---

[9] 36 M.J. 150, 169 n.23 (C.M.A. 1992).

[10] Id.

[11] Id.

[12] State v. Coleman, 707 N.E.2d 476, 488 (Ohio 1999).

12

untrustworthy."[13]  If only a part of the tape is inaudible, the military judge must determine whether those portions are so substantial as to render the entire tape untrustworthy and thus inadmissible.  The military judge should clearly state on the record which portions of an audiotape are inaudible.

In this case, at one point the military judge remarked that the audio tape was "not audible."  Unfortunately, the military judge never revisited this comment after listening to the tape several additional times both in court and in chambers.  Nevertheless, the record makes clear that the tape was not entirely inaudible.  When the tape was first played in court, the president indicated that he could "partially" understand it.  The tape was sufficiently clear for PFC Pearsall to identify the voices on it and vouch for the tape's accuracy.  Another witness — a disinterested non-commissioned officer — also testified that he could both understand and identify the voices on the tape.

Because the tape itself was admissible, it was appropriate to provide the members with a "substantially accurate"[14]

---

[13]  Monroe v. United States, 234 F.2d 49, 55 (D.C. Cir. 1956).

[14]  See United States v. Brandon, 363 F.3d 341, 344 (4th Cir. 2004) (holding that a "substantially accurate" transcript of a recording of a drug transaction was admissible); United States v. Watson, 594 F.2d 1330, 1336 (10th Cir. 1979) (holding that a "substantially accurate" transcript of tapes of intercepted telephone calls was admissible); cf. United States v. Arruza, 26 M.J. 234, 236 (C.M.A. 1988) (holding that a "substantially verbatim" transcript of Article 32 testimony was admissible under Military Rule of Evidence 804(b)(1)).

transcript of the tape.  The Ninth Circuit Court of Appeals recently highlighted four important procedural protections when the government offers a transcript in a criminal case:  (1) the trial judge should "review[] the transcript for accuracy"; (2) the defense counsel should be "allowed to highlight alleged inaccuracies and to introduce alternative versions"; (3) the jury should be "instructed that the tape, rather than the transcript, was evidence"; and (4) the jury should be "allowed to compare the transcript to the tape and hear counsel's arguments as to the meaning of the conversations."[15]

What occurred at Appellant's trial was not a model for executing this four-step process.  Nevertheless, we conclude that each of these four steps, which should guide military judges in ruling on the admissibility of transcripts, was sufficiently satisfied to result in the transcript's admissibility.

Regarding the first step, the military judge did review the transcript for accuracy.  However, he never clearly stated for the record the results of that review.  He should have stated what portions of the tape were audible and described the results of his comparison of those audible portions with the transcript. In the future, military judges should explicitly announce this determination for the record.  Nevertheless, we are satisfied

---

[15]  United States v. Delgado, 357 F.3d 1061, 1070 (9th Cir. 2004).

14

that in this case the military judge implicitly made this determination which he should have explicitly announced.  A review of the tape and transcript reveals that when the military judge compared the two, he would have found that while the transcript is not perfectly verbatim, it is substantially accurate.[16]  Additionally, neither at trial nor on appeal has Appellant identified any substantial inaccuracy in the transcript.

The second procedural protection was also satisfied.  The trial defense counsel had repeated opportunities to challenge the accuracy of the transcript, and did so at one point — though his attack was limited to challenging an inconsequential appearance of the word "where" in the transcript.

The military judge also solicited from the defense, and delivered, a cautionary instruction concerning how the members should use the transcript.  Appellant complains on appeal about the contents of this instruction, even though it was delivered without defense objection at trial.

The military judge's limiting instruction could have been more artfully crafted.  As the United States Court of Appeals for the District of Columbia Circuit has observed:

---

[16]  See Watson, 594 F.2d at 1336 (noting that the appellate court's own review of a tape revealed "that the transcripts are substantially accurate").

15

> [T]he jury should be instructed that the tape
> recording constitutes evidence of the recorded
> conversations and the transcript is an interpretation
> of the tape. The jury must be instructed that they
> should disregard anything in the transcript that they
> do not hear on the recording itself. Moreover, the
> court must ensure that the transcript is used only in
> conjunction with the tape recording.[17]

While the military judge's instruction in this case did not include all of that guidance, it was sufficient to withstand the appellate attack in light of the defense's failure to object at trial.[18]

Finally, the military judge gave the members an opportunity to compare the tape and the transcript when they deliberated. Appellate courts have differed over whether transcripts should be used only as demonstrative exhibits within the courtroom or should accompany the jurors to the deliberation room.[19] We join the majority of federal courts of appeals in holding that trial judges have considerable discretion in determining whether to allow the fact finder to consider such transcripts during

---

[17] United States v. Holton, 116 F.3d 1536, 1543 (D.C. Cir. 1997).

[18] See United States v. Simpson, 58 M.J. 368, 378 (C.A.A.F. 2003) (holding that any deficiency in instructions "is waived by defense counsel's failure to object unless the instructions were so incomplete as to constitute plain error"); see also Rule for Courts-Martial 920(f).

[19] See generally State v. Rogan, 640 N.E.2d 535, 545-50 (Ohio Ct. App. 1994) (and cases cited therein); see also United States v. Breland, 356 F.3d 787, 794-95 (7th Cir. 2004).

16

deliberations.[20]  That determination will not be reversed on appeal absent an abuse of discretion.

In this case, the military judge properly exercised his discretion to allow the members to take the transcript to the deliberation room.  He made clear that he wanted to give the members an opportunity to compare the tape with the transcript.  Allowing the members to take the tape to the deliberation room was a reasonable means to accomplish that goal.

## Decision

We affirm the decision of the United States Army Court of Criminal Appeals.

---

[20]  See, e.g., United States v. Placensia, 352 F.3d 1157, 1165 (8th Cir. 2003); United States v. Ademaj, 170 F.3d 58, 65 (1st Cir. 1999); Holton, 116 F.3d at 1541-43; United States v. Elder, 90 F.3d 1110, 1130 (6th Cir. 1996); United States v. Crowder, 36 F.3d 691, 697 (7th Cir. 1994); United States v. Rosa, 17 F.3d 1531, 1548 (2d Cir. 1994); United States v. Taghipour, 964 F.2d 908, 910 (9th Cir. 1992); United States v. Costa, 691 F.2d 1358, 1362-63 (11th Cir. 1982).