UNITED STATES

v.

**First Lieutenant James L. MILLER,
United States Air Force.**

ACM 36252.

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 22 Feb. 2004.

30 March 2007.

Appellate Counsel for Appellant: Colonel Nikki A. Hall, Lieutenant Colonel Mark R. Strickland, Major Sandra K. Whittington, Captain Anthony D. Ortiz, and Mary T. Hall.

Appellate Counsel for the United States: Colonel Gerald R. Bruce, Colonel Gary F. Spencer, Lieutenant Colonel Robert V. Combs, Major Michelle M. McCluer, and Captain Daniel J. Breen.

Before BROWN, MATHEWS, and THOMPSON, Appellate Military Judges.

## OPINION OF THE COURT

MATHEWS, Senior Judge:

The appellant stands convicted, contrary to his pleas, of one specification of attempted rape, two specifications of forcible sodomy, two specifications of assault, and two specifications of kidnapping, in violation of Articles 80, 125, 128, and 134, UCMJ, 10 U.S.C. §§ 880, 925, 928, 934. He pled guilty to, and was convicted of, an additional specification alleging conduct unbecoming an officer and a gentleman, in violation of Article 133, UCMJ, 10 U.S.C. § 933, for several incidents in which he surreptitiously videotaped consensual sex acts without the knowledge or permission of his partner. His approved sentence consists of dismissal from the service, confinement for 12 years, and forfeiture of all pay and allowances.

Before us, the appellant asserts numerous errors he contends took place prior to, during, and after his trial. We find none of the appellant's claims concerning events prior to the adjournment of his court-martial persua-sive, and we therefore affirm the findings; however, because we find some merit to his claim of unreasonable post-trial delay, we grant relief as detailed below.

### Background

The appellant was assigned to the Space and Missile Systems Center at Los Angeles Air Force Base (AFB), California, tasked with duties relating to the acquisition of satellite systems. His work record was for the most part exemplary; but his off-duty record was clearly substandard. Prior to his court-martial, the appellant received a letter of admonishment for an incident in which he videotaped himself and a civilian woman engaged in a consensual sex act and then called his partner a "whore" when she expressed fear the tape would wind up on the Internet and sought to obtain the tape from him. The appellant also was convicted in a California civilian court of soliciting prostitution, an offense for which he was placed on probation for one year.

The events that led to the appellant's court-martial began the evening of 3 April 2003 on the Pacific Coast Highway ("PCH"), a stretch of road that runs most of the length of California's coastline. JDA, a civilian with no prior relationship with or connection to the appellant, was kidnapped at gunpoint while walking along the PCH not far from Los Angeles. According to JDA, the assailant brandished a pistol and ordered her into his light-color BMW automobile. Fearing he would shoot her if she refused, she complied.

The assailant drove to a residential area, parked the car in a garage, and told JDA to get out. Again, she complied, noting as she did so that there was another car, red in color, also parked in the garage. With the gun still pointed at her, the assailant led JDA into the house attached to the garage and then to an upstairs bedroom. Later, she was able to recall that the front door of the house, which she passed on the way to the stairs, had a window shaped like a "half sun" with glass panes that looked like sunbeams, and that the bedroom was furnished with a bed, an office-style chair, a desk and computer, Venetian blinds on the window, and a throw rug on the floor.

The assailant told JDA to orally sodomize him, and pointed the gun at her during the act. Eventually, he ejaculated and told JDA to swallow his semen. He at one point attempted to engage in intercourse with her, ordering her to pull down her pants and get on her hands and knees. He took a condom from a drawer of the nearby desk and placed the condom on his penis, but apparently was dissuaded from completing the act when he found JDA was menstruating.

Afterward, JDA said, her assailant drove her away from the house and ordered her out of the car, leaving her on the side of the road. JDA was able to locate a phone and call for help. She provided the local police with a description of the car, the gun, and the kidnapper, but was unable to provide enough detail for them to identify her assailant at that time.

A week later, another woman, NM, filed a similar report with the civilian police. On the evening of 10 April 2003, NM was waiting at a bus stop when a man driving a silver BMW drove up and stopped. The man told her that the bus was not coming. He then brandished a pistol and told NM to get in the car or he would shoot her. When she complied, he drove away with her.

While driving, the man opened his pants and exposed his penis and, pointing the gun at NM, said "This is what you're here for." He told her to orally sodomize him and she did so. He also ordered her to swallow his semen, but did not, at this point, actually ejaculate. At several different times while driving, the assailant spoke to NM, telling her to stop crying and that, if she would just do as he wanted, it would all be over soon. At one point, he claimed to have videotaped a sex act with another woman and put it on the Internet.

Eventually, the kidnapper parked the BMW in a residential garage. NM noted a motorcycle and another car in the garage, and thought she heard voices inside the house. Later, she recalled fearing that the people in the house would join in sexually assaulting her. Instead, however, the assail-

ant masturbated himself to the point of ejaculation and then insisted that NM take his penis in her mouth. She did so, and he ejaculated; but she did not obey his command to swallow his semen. The assailant got a black baseball cap and put it over NM's face, and then got out of the car and retrieved a striped blanket, similar in design to a Mexican *serape*, from the trunk. When the blanket was covering her, NM spit the semen onto her sweatshirt.

The assailant got back in the car, drove NM away from the house, and stopped in the Redondo Beach area, where he ordered her to get out. As he drove off, NM was able to see the BMW's license plate: the first two characters were "4W" and the next two, she believed, were "RT." Like JDA before her, NM promptly reported the attack to the local police.

Based on the partial license plate number provided by NM, the police identified a silver BMW registered to the appellant, bearing the license number "4WJT870," that had previously been listed on a traffic citation issued in Redondo Beach. Acting on the partial match, they obtained the appellant's driver's license photo from the California Department of Motor Vehicles and used it, along with five similar photos, to prepare a photographic line-up (called a "six-pack"). On viewing the six-pack, NM selected the photo of the appellant and identified him as her assailant.[1] The officers obtained an arrest warrant for the appellant and a warrant to search the appellant's home and car.

The search of the appellant's home found a red car and a motorcycle in the garage. The front door of the house was set with a window consistent with the "half sun" pattern described by JDA. The bedroom contained furnishings that were also consistent with her description. There were condoms in the desk drawer in the bedroom—again, matching JDA's description—and a 9mm pistol. The police also searched the appellant's BMW, finding a striped *serape*-style blanket and a black baseball cap in the trunk, items

---

1. JDA, when presented with a similar photographic line-up, was unable to identify her at-
tacker.

consistent with NM's account of events. DNA samples subsequently taken from the appellant matched the DNA in the semen stains found on NM's sweatshirt. The examining laboratory put the odds against another person being the source of the semen at 660 trillion to one.

In addition to collecting the evidence detailed above, the police interviewed the appellant to obtain, as they phrased it, "[his] side of the story." The civilian detectives interrogating the appellant properly advised him of his rights under the Fifth and Sixth Amendments to the United States Constitution and obtained his consent to their questioning. At one point, the appellant asked the detectives whether it would be "advisable" to have an attorney present; they replied that the decision was "totally up to [him]." They further informed the appellant that if he decided to invoke his right to an attorney, they would terminate the interview and tell him nothing further about the case; but also that, if he wanted, he could begin the interview process and terminate it at any time by asking for a lawyer. The appellant decided to proceed with the interrogation.

During the course of the interview, the appellant generally told a tale consistent with NM's version of events, varying primarily in his insistence that all sexual activity between NM and himself was purely consensual. The appellant related that he picked up a woman—whose name the appellant said he could not recall—from a bus stop and took her to his home, where she "started to" "give [him] oral sex." The appellant related that he "might have started" to ejaculate, but that the woman asked him to stop, and he did so. When they left his house, he said, he dropped her off at her request on the side of the road and she vanished into the night.

The appellant denied any use of force, but explained that, during the course of a discussion of real estate values in his neighborhood, he volunteered to the woman the fact that he owned a gun. He said he spontaneously went upstairs to his bedroom to get the gun to show it to her. She then became upset, he claimed, and demanded to leave. As he was complying with her request, he said, he mentioned that he had a girlfriend, which seemed to upset the woman even more. He maintained steadfastly, however, that he in no way coerced or threatened anyone.

The appellant also maintained that this was the only occasion on which he picked up a stranger and engaged in sexual relations with her: "No, the only girl is the one I told you about ... that's it." The civilian detectives expressed skepticism, pointing out that they had two different women who had told substantially the same tale; but the appellant remained steadfast. On more than a dozen occasions during the course of the interview, the appellant firmly insisted that he "didn't pick any girl up anywhere," other than the woman who talked about real estate and gave him oral sex.

About halfway through the interview, however, the appellant changed his story. His earlier denials notwithstanding, the appellant related how he "picked up another girl" from the PCH and took her to his home, where she "gave [him] oral sex." He told the officers that he and the woman—whose name, again, he could not recall—"got into a really nice conversation" before driving off together and that, during the course of that conversation, the appellant told her he had a gun. He said, however, that he never actually showed it to her.

According to the appellant, the woman spontaneously volunteered that he "wouldn't have to force her," and told him that she was not a prostitute. Moments later, however, the appellant changed his story again, denying that the woman said anything about being, or not being, a prostitute. He said that, after engaging in sexual activity, this woman too preferred to be dropped at the side of the road. He told the detectives he complied with her wishes.

*Procedural History*

The appellant's commander preferred charges on 19 May 2003. The appellant's pretrial hearing, conducted pursuant to Article 32, UCMJ, 10 U.S.C. § 832, was held in June and July 2003. JDA and NM both appeared as witnesses and their testimony was transcribed verbatim. The appellant was represented by both a circuit defense counsel and retained civilian counsel. The

appellant's trial defense team vigorously represented him at the Article 32 hearing, ultimately winning dismissal of two specifications; but the remaining charges and specifications, including the most serious allegations of kidnapping, forcible sodomy, and attempted rape, were referred to trial by general court-martial on 25 August 2003.

The appellant's trial convened on 28 October 2003 and continued for all or part of 19 days over the course of the next 5 months. The trial featured 2 presiding judges, 3 court reporters, 5 counsel, 43 trial exhibits, and 106 appellate exhibits. JDA and NM both testified against the appellant, as did one of the civilian police detectives who interviewed him. The prosecution also played a videotape of the interview (minus redactions requested by the appellant's trial defense counsel) and presented the members with a transcript of the redacted video. After having thus heard both sides of this "she-said, he-said, she-said" case, a panel of officer members found the appellant guilty of virtually all of the contested charges and specifications alleged against him.[2] The members announced sentence on 22 February 2004.

The record of the appellant's trial comprises 18 volumes and the trial transcript is 1,748 pages in length. The preparation of this record included two lengthy hiatuses, totaling approximately six months of inactivity. The first court reporter to participate in the appellant's trial did not begin her transcription until 7 April 2004, some six weeks after the end of the appellant's trial; she was on leave until 25 February 2004, and from 26 February until 7 April, a period of 40 days, was assigned to work on hospital recovery claims for the base legal office. The next lull in the

preparation of the appellant's record stretched from mid-April 2004 to 19 August 2004, during which time the record was waiting for review by the trial counsel. By happenstance, the trial counsel was on terminal leave, about to separate from the service. He never did complete his review of the record. When more than four months passed without completion of the review, the Los Angeles AFB staff judge advocate (SJA) assigned the task to other judge advocates. They finished reviewing the record on 13 September 2004. The SJA's staff then sent the record to the appellant's military trial defense counsel for review.[3] The appellant submitted clemency matters to the convening authority on 24 February 2005, and the convening authority took action one month later, on 24 March 2005.

### Discussion

The appellant has assigned 11 purported errors for this Court's consideration. We discuss them generally in the order he raised them, grouping some together for ease of analysis and discussion.

### The Appellant's Videotaped Interview and its Transcript

The appellant's first two assignments of error generally allege the military judge erred in handling the appellant's taped interview with civilian police and, in particular, the transcript of that interview. Although the appellant acknowledges raising no objection prior to or during trial, he argues the military judge should have nonetheless suppressed the tape and the transcript, as well as testimony from the detective concerning

---

**2.** The members found the appellant not guilty of assault with a dangerous weapon against JDA and NM, but guilty of the lesser included offense of assault with an unloaded firearm. As noted above, the appellant had already pled guilty to one charge and specification of conduct unbecoming an officer, in violation of Article 133, UCMJ.

**3.** The post-trial source documents for the chronology cited above were referenced by both parties in their excellent appellate briefs, but neither moved for their admission by this Court. We are mindful of our superior appellate court's admonition that "[n]ot everything 'between the blue covers' is a part of the record," *United States v.*

*Leal,* 44 M.J. 235, 236 (C.A.A.F.1996), but routinely consider such documents where they are helpful to our analysis of the issues. *See, e.g., United States v. Mahoney,* 36 M.J. 679, 689, n. 8 (A.F.C.M.R.1992). Here, we admitted the source documents relied on by the parties—the court reporter's transcription logs found in Volume 1 of the Record of Trial, and the memorandum setting forth a chronology of the post-trial processing of the case, signed by Captain LND and dated 3 December 2004, found in Volume 10—on our own motion. Courts of Criminal Appeals, Rules of Practice and Procedure, Rules 3, 23, and 24.

the appellant's statements, because the civilian police violated his right to silence.

**■** Failure to make a timely objection at trial to the admissibility of evidence constitutes waiver, in the absence of plain error. Mil. R. Evid. 103(a)(1) and (d); *United States v. Datz,* 61 M.J. 37, 42 (C.A.A.F.2005). The appellant bears the burden of demonstrating that there was an error, that the error was plain or obvious, and that it materially prejudiced the appellant's substantial rights. *United States v. Hays,* 62 M.J. 158, 166 (C.A.A.F.2005) (citing *United States v. Powell,* 49 M.J. 460, 463–65 (C.A.A.F.1998)). The appellant argues that "[a]lthough [the police detectives] initially stated [the appellant's] *Miranda* rights correctly,"[4] they subsequently "coerced [the appellant] into waiving his rights" by refusing to provide details of the allegations against him prior to his waiver of rights. This act of "coercion," the appellant contends, was clearly depicted on the videotape played in open court and therefore seen by the military judge, obliging her to *sua sponte* exclude all evidence from the interview. The military judge's failure to do so, the appellant claims, amounted to plain error.

We cannot agree, for we find no error at all, let alone one that is plain or obvious. *United States v. Cardreon,* 52 M.J. 213, 217 (C.A.A.F.1999). Although military investigators are obliged to provide a suspect with sufficient information to inform him "of the nature of the accusation,"[5] civilian police are not required to do the same. The appellant, while conceding this point, argues the police interrogator "watered down" his rights "by advising him that if [he] elected counsel, the questioning would cease" and the interrogators would not provide him with further information about the allegations.

It is, of course, black-letter law that interrogation must stop when the suspect asks for counsel. *See generally Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704

(1988); *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983); *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *United States v. Mitchell,* 51 M.J. 234 (C.A.A.F.1999); *United States v. Brabant,* 29 M.J. 259 (C.M.A.1989). We fail to see how correctly informing the appellant of this well-established protection amounted to a violation of his rights. Viewing the appellant's videotaped interrogation ourselves, we find he was subjected to no coercion, intimidation, or unlawful inducement to persuade him to waive his rights. The questioning was conducted in a conversational tone and, while the officers expressed disbelief at some of the appellant's statements, they maintained an air of polite composure. Although there was clearly some discussion between the appellant and the police officers prior to the start of the videotape,[6] nothing in the taped portion suggests the prior discussion was in any way improper, nor is there any other evidence in the record to suggest the appellant's will was overborne. Finally, the appellant's demeanor, as seen on the tape, is utterly inconsistent with his current claims of coercion. We find the appellant waived his rights freely and did so because he wanted to. That he now regrets his decision does not make it any less voluntary.

The appellant further contends that, admissibility notwithstanding, evidence concerning his interview was presented in an improper form and without proper instructions to the members. Relying on *United States v. Craig,* 60 M.J. 156 (C.A.A.F.2004), he argues the military judge erred by permitting a transcript of the interview to be presented to the members. In particular, the appellant asserts the military judge neither entered findings regarding the accuracy of the transcript nor advised the members that they should regard the videotape as authoritative in the event it differed from the transcript.

4. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. Article 31(b), UCMJ, 10 U.S.C. § 831(b).

6. At the beginning of the interview, the lead interviewer told the appellant that if he chose to invoke his rights, she would stop questioning him and not tell him "anything about why you are here or anything, *other than what I've already told you.*" (Emphasis added).

■ Because the appellant did not challenge the accuracy of the transcript before its admission or contest the adequacy of the military judge's instructions during trial, we once again test for plain error. *United States v. Brewer*, 61 M.J. 425, 430 (C.A.A.F. 2005); *Datz*, 61 M.J. at 42. We find the appellant has again failed to meet his burden. Although the military judge did not enter specific findings concerning the accuracy of the transcript, we have compared it to the tape and find the transcript "substantially accurate," as called for by our superior appellate court in *Craig*.[7] We agree with the appellant that the military judge did not follow the four-step procedure outlined in *Craig*, but note that *Craig* was not yet decided at the time of the appellant's trial. We find nothing in the *Craig* decision mandating reflexive and retroactive application. The purpose of *Craig*, and of the cases cited therein, is to protect an accused against an unjust conviction based on fraudulent transcription or even on simple scrivener's error. We find the appellant received the protection he was due.

■ The transcript was substantially accurate; the appellant's trial defense counsel had the opportunity to highlight any perceived inaccuracies in the transcript (and in fact, did so during argument); and the members received both the tape and the transcript and had the opportunity to compare them in open court and in their closed-session deliberations. Though the military judge did not tell the members to rely on the tape rather than the transcript, should they differ, we conclude the absence of this instruction did not materially prejudice the appellant. As we recently reminded trial practitioners in *United States v. Brewster*, 64 M.J. 501 (A.F.Ct.Crim.App.2006), "[c]ourt-martial members are neither children nor dullards." *Id.* at 502 (citations omitted). We have no doubt that, when comparing the

videotape to the transcript, the members appropriately relied on what they saw and heard the appellant actually say. Moreover, the appellant has not directed our attention to any error in the transcript he believes prejudiced his case, and we are unable to find one ourselves. Thus, we conclude that, even if the military judge erred, it did not rise to the level of plain error. *Hays*, 62 M.J. at 166.

### Ineffective Assistance of Counsel

The appellant next complains his trial defense counsel were ineffective,[8] in part because they failed to seek suppression of the appellant's statements to the police. As we have already concluded the appellant's rights were not violated in the taking of those statements, the appellant's contention in this regard is without merit. *United States v. Napoleon*, 46 M.J. 279, 285 (C.A.A.F.1997). The appellant also argues his trial defense team did not adequately investigate his case, claiming in particular that they failed to question unnamed persons who he says could possibly have identified passersby who might have been able to cast doubt on a collateral element of NM's story: *i.e.*, that he drove away quickly from the scene where she was abducted. The appellant also complains his trial defense counsel should have probed a news report, appearing subsequent to his arrest, about another abduction in the Los Angeles area similar to the ones reported by JDA and NM. Finally, he contends, his civilian defense counsel's argument in findings essentially invited the members to find the appellant guilty if they disagreed with his counsel's recounting of the evidence at trial.

■ Service members have a fundamental right to the effective assistance of counsel at trial by courts-martial. *United States v. Knight*, 53 M.J. 340, 342 (C.A.A.F.2000) (citing *United States v. Palenius*, 2 M.J. 86 (C.M.A.1977)). We analyze the effectiveness

---

7. Indeed, both parties for the most part treated the transcript as though it was a verbatim record of the interview. For example: during a lengthy session concerning redactions to the tape sought by the appellant, the appellant's trial defense team and the trial counsel relied exclusively on the transcript, citing it by line and page number. At no point did they seek to substitute the tape

for the transcript. The conduct of the parties at trial adds to the confidence we garnered from our own review that the transcript was "substantially accurate."

8. This issue was raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982).

of counsel under the framework established by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Though counsel are presumed competent, a showing of judgment or conduct unreasonable under prevailing professional norms may rebut that presumption. *Id.* at 687., 104 S.Ct. 2052 The appellant bears the burden of persuasion. *United States v. Garcia,* 59 M.J. 447, 450 (C.A.A.F.2004); *United States v. McConnell,* 55 M.J. 479, 482 (C.A.A.F.2001). If the appellant succeeds, we test for prejudice. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *see also United States v. Polk,* 32 M.J. 150, 153 (C.M.A.1991).[9]

■ We find the appellant has failed to carry his burden. Even if true, the conduct he describes would not establish ineffectiveness of counsel under the facts of this case. *United States v. Grigoruk,* 52 M.J. 312, 315 (C.A.A.F.2000). The avenues available to the appellant's trial defense team were sharply constrained by the appellant's own shifting and internally-contradictory versions of the events of April 2003. Had the appellant chosen to exercise his right to silence when interviewed by the police, the defense might profitably have pursued the notion that the assailant in the news report was actually the person who took JDA and NM off the street; but the appellant's admissions rendered such an approach untenable.[10] Thus, rather than focusing on unidentified witnesses who might challenge the minutiae of NM's story, the defense strategy was to mount a full-throated attack on the claims of force and nonconsent by introducing the medical and police histories of both women.

We do not question such strategic decisions simply because, in the end, they prove unsuccessful. *United States v. Morgan,* 37 M.J. 407, 410 (C.M.A.1993); *United States v. Kibler,* 43 M.J. 725, 730 (Army Ct.Crim.App. 1995) ("The test of counsel's performance is not that he lost; and, it is not that some number of options were not pursued," but rather whether the adversarial process was reliable enough to produce a just result). Nor do we find that the single turn of phrase complained of by the appellant rendered his counsel's argument ineffective under the standards of *Strickland* and *Polk.* Viewed "in the context of the ... appellant's trial," we find the performance of the appellant's counsel extraordinarily diligent and vigorous. *United States v. Hansen,* 36 M.J. 599, 611 (A.F.C.M.R.1992). The appellant was convicted, not because of the failings of his counsel, but because he was in fact guilty.

*Post–Trial Processing*

■ Finally, the appellant asserts that errors in the post-trial processing of his case entitle him to relief under a variety of theories. We considered each and we find none persuasive, save for one: the length of time spent processing the appellant's case prior to the convening authority's action was, as the appellant claims, inordinately excessive.

Government counsel urge us to find that the 13–month lapse of time between the conclusion of the appellant's trial and the convening authority's action was not "facially unreasonable" given the length and complexity of the case, and to further find the appellant was not prejudiced thereby. Following this reasoning, the government contends, the appellant is not entitled to any relief. The appellant, for his part, argues that "the length of a record of trial simply makes the record more time-consuming to prepare; it

---

9. In extreme cases where the conduct of the trial defense team is so lacking that it results in "a total breakdown of the adversarial process," no further showing of prejudice is required. *United States v. Larson,* 64 M.J. 559, 564 (A.F.Ct.Crim. App.2006); *United States v. Hennis,* 40 M.J. 865, 867 (A.F.C.M.R.1994) (citing *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). We find no such breakdown here. The appellant's counsel mounted an exceptionally energetic defense at trial, filing motion after motion, orally and in writing, seeking to discover exculpatory evidence and limit both their client's criminal liability and the arsenal of information available to the government. Over 100 appellate exhibits are appended to the record of trial, comprising a veritable testament to the extensive efforts of the trial defense team.

10. Moreover, the other evidence in the case— JDA's description of the contents of the appellant's home, NM's identification of the appellant from the "six-pack" photo lineup, both the victims' identification of the appellant in court, and the DNA evidence taken from NM's sweatshirt— corroborated the appellant's self-identification.

does not axiomatically make preparation of the record more 'complex.' " While we agree with the appellant's general proposition, we find, in *this* case, the length of the record is a direct product of the complexity of the case.

That finding does not, however, end our inquiry. We commend the participants in the appellant's trial, and his appeal, for their zeal and dedication to the cause of justice. For the most part, the appellant's case moved with all the speed that could be expected of a trial with such high stakes: the charges were extraordinarily grave, the transcript long, the exhibits many, and the large supporting cast of counsel, court reporters, and judges was well beyond the norm seen in court-martial practice. Nonetheless, the post-trial processing of the appellant's case was far less adroitly handled than it could and should have been. In particular, we find that the six-week-plus period while the first court reporter processed other, non-military justice paperwork, and the over four months during which the record languished in an empty office awaiting assignment of counsel to conduct a review, were facially unreasonable delays. We further find they were delays for which the government is solely to blame.

The appellant contends these delays prejudiced him in two respects: first, citing *United States v. Moreno*, 63 M.J. 129, 138 (C.A.A.F.2006), he claims he suffered "constitutionally cognizable anxiety" as to the final resolution of his case; second, he contends he was "advised" by unnamed persons that his case would not be considered for parole until the convening authority took action. Addressing only the second of these issues, the government argues we should follow our decision in *United States v. Bigelow*, 55 M.J. 531 (A.F.Ct.Crim.App.2001), *aff'd*, 57 M.J. 64 (C.A.A.F.2002). The government contends that under prevailing rules, the appellant could have applied for clemency even before the convening authority acted by seeking a waiver, and further notes that a grant of parole is highly discretionary, and attempting to determine whether a particular appellant would be favorably considered requires "speculation, and therefore, provides no basis for finding specific prejudice." *Bigelow*, 55 M.J. at 533–34. We reaffirm our holding.

In completing our evaluation of this assignment of error, however, we are further informed by our superior appellate court's guidance in *United States v. Tardif*, 57 M.J. 219 (C.A.A.F.2002). There, the Court of Appeals for the Armed Forces concluded that service courts of appeal have authority under Article 66(c), UCMJ, 10 U.S.C. § 866(c), "to grant relief for excessive post-trial delay without a showing of 'actual prejudice' [if] appropriate under the circumstances." *Id.* at 224. Although we are unconvinced by the appellant's assertion that his "anxiety" in this case is a sufficient basis for such relief, we are persuaded by Judge Erdmann's observation in *United States v. Oestmann*, 61 M.J. 103 (C.A.A.F.2005) that excessive post-trial delays "erode servicemembers' confidence in the military justice system as well as the public's perception of fairness in the system." *Id.* at 106–07 (Erdmann, J., concurring and dissenting in part). Exercising our Article 66(c), UCMJ, authority to approve only so much of the appellant's sentence as we find appropriate,[11] we therefore grant relief in the form of a six-month reduction in the appellant's term of confinement. We find the remainder of the appellant's sentence to be appropriate for the appellant and his offenses.

### Other issues

We considered the appellant's remaining assignments of error and find them to be without merit. *United States v. Matias*, 25 M.J. 356, 361 (C.M.A.1987).

11. We note that the appellant, in his submission of matters to the convening authority under Rules for Courts–Martial 1105 and 1106, sought relief owing to the lapse between his trial and preparation of the staff judge advocate's recommendation (SJAR). Before us, he characterizes his request as an assertion of legal error, which he claims mandated inclusion in the addendum to the SJAR and recusal of the SJA. We find, however, that at the time it was submitted, the appellant specifically cast his request to the convening authority as one seeking "clemency," rather than an assertion of legal error. Such requests require neither inclusion in the addendum nor recusal of the SJA.

## Conclusion

The findings and sentence, as set forth above, are correct in law and fact, and no further errors prejudicial to the substantial rights of the appellant occurred. Article 66(c), UCMJ; *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F.2000). Accordingly, the findings and only so much of the sentence as provides for dismissal from the service, confinement for 138 months, and forfeiture of all pay and allowances are

AFFIRMED.