# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

## No. ACM S32649

———————————

### UNITED STATES
*Appellee*

v.

### Constance S. VAUGHN
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 6 October 2021

———————————

*Military Judge:* Matthew P. Stoffel.

*Sentence:* Sentence adjudged on 20 December 2019 by SpCM convened at Andersen Air Force Base, Guam. Sentence entered by military judge on 15 January 2020: Bad-conduct discharge; hard labor without confinement for 30 days; restriction to the limits of Andersen Air Force Base, Guam, for 2 months; forfeiture of $500.00 pay per month for 2 months; reduction to E-1; and a reprimand.

*For Appellant:* Major Alexander A. Navarro, USAF.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before LEWIS, ANNEXSTAD and OWEN, *Appellate Military Judges*.

Senior Judge LEWIS delivered the opinion of the court, in which Judge ANNEXSTAD and Judge OWEN joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

LEWIS, Senior Judge:

At a special court-martial, in accordance with her pleas, a military judge found Appellant guilty of one specification of dishonorable failure to pay a just debt in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934. Contrary to her pleas, a panel of officer members found Appellant guilty of one specification of larceny, two specifications of wrongful appropriation, one specification of obstruction of justice, and a second specification of dishonorable failure to pay a just debt, in violation of Articles 121, 131b, and 134, UCMJ, 10 U.S.C. §§ 921, 931b, 934, respectively.[1,2] The officer members sentenced Appellant to a bad-conduct discharge, hard labor without confinement for 30 days, restriction to the limits of Andersen Air Force Base (AFB), Guam, for two months, forfeiture of $840.00 pay per month for two months, reduction to the grade of E-1, and a reprimand. The convening authority took action on the sentence by reducing the forfeitures to $500.00 pay per month for two months.

Appellant raises four assignments of error which we have reworded: (1) whether the military judge abused his discretion when he denied a motion to suppress Appellant's statements and derivative evidence; (2) whether the larceny and wrongful appropriation convictions are legally and factual insufficient; (3) whether the dishonorable failure to pay a just debt conviction that was contested at trial is legally and factually insufficient; and (4) whether the military judge abused his discretion when he admitted a "transcript" of text messages as a prosecution exhibit.

We combine issues (2) and (3) and find the specifications legally and factually sufficient, except for a portion of the charged timeframe for the dishonorable failure to pay a just debt specification that was contested at trial. Accordingly, we narrow the charged timeframe for this specification in our decretal paragraph. Otherwise, we find no material prejudice to Appellant's substantial rights and affirm the findings, as modified, and the sentence.

---

[1] The specifications covered the time period from 30 March 2019 to 4 December 2019. References to the UCMJ, Military Rules of Evidence, and the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.). Further, the Military Justice Act of 2016, National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, §§ 5001–5542 (23 Dec. 2016), as fully implemented by Exec. Order 13,825, 83 Fed. Reg. 9889 (8 Mar. 2018), applied to Appellant's court-martial and post-trial processing.

[2] The court members acquitted Appellant of one specification of larceny. The court members also found Appellant guilty of a lesser-included offense of wrongful appropriation that was charged as larceny.

## I. BACKGROUND

Appellant arrived at Andersen AFB, Guam, in June 2017. By 2018, her finances were in disarray which led to a series of decisions by her in 2019 that resulted in her convictions. We describe the specification that she pleaded guilty to and then the contested specifications.

Appellant pleaded guilty to one specification of dishonorable failure to pay a just debt to a rental car agency. Appellant rented a car for two weeks in October 2018 after her vehicle became inoperable. The rental car company required a major credit card and refused to accept Appellant's debit card to rent the car. Appellant requested a friend place his credit card "on file" to allow Appellant to rent the car. Appellant agreed that she would pay her friend for any charges to his credit card.[3]

Appellant did not return the rental car at the end of the two-week rental contract. Instead, Appellant kept the rental vehicle until 22 April 2019 and owed over $5,600.00 by the time the vehicle was returned. Once the vehicle was returned, Appellant agreed to a payment plan with the rental car agency but made no payments. The rental car agency contacted Appellant at least monthly and Appellant mostly ignored them but also was evasive by telling them that she would call them back or stop in to the agency and then failing to do so. In the providence inquiry, Appellant agreed that her failure to pay the debt was "pretty deliberate" and that she "had the money but [she] did not think that it was important to pay them." Appellant explained that she had a "grossly indifferent attitude" towards paying this debt from the charged time period of 22 April 2019 to 31 October 2019 and her actions put "a stain on the military core values." The rental car staff knew Appellant was a member of the Air Force stationed at Andersen AFB.

Contrary to her pleas, Appellant was convicted of a second dishonorable failure to pay a just debt specification which involved a $2,550.00 loan Appellant received from another servicemember in her squadron, LB. Appellant asked LB in March 2019 for the loan to pay her overdue rent at her off-base residence so she could avoid eviction. LB agreed to make the loan and Appellant signed a promissory note that she would repay the full amount by 30 March 2019.

In April through June of 2019 LB made extensive efforts to collect the debt

---

[3] The credit card of Appellant's friend was charged three separate times totaling more than $1,500.00 before the card stopped working for the rental car agency. At the time of trial, Appellant had not repaid her friend for the charges to his credit card. However, Appellant was not charged with an offense for failing to repay her friend.

and Appellant evaded him and made false promises that payment was forthcoming. LB made his first request for repayment on 7 April 2019. Appellant agreed to meet LB to transfer the money and to call LB when she could, but then did not call him or meet him. On 12 April 2019, LB texted Appellant requesting a meeting. Appellant did not respond. Over the next few weeks Appellant provided LB various excuses on why a wire transfer to repay him had not worked. This prompted LB to request a cash payment. Appellant did not pay LB in cash. Further discussions in late April to early May 2019 focused on the logistics for Appellant directly transferring money into LB's credit union account. On 5 May 2019, LB messaged Appellant asking if she could do the transfer the next day. Appellant agreed, then failed to transfer any money to LB. Later in May 2019, Appellant and LB met in person and Appellant offered an explanation for her financial problems, which may or may not have been true, and Appellant proposed that someone else could pay the debt in June 2019 if her financial problems were not resolved. Appellant did not follow up with LB, again forcing LB to reach out to her. She again failed to respond.

In June 2019, frustrated by Appellant's repeated failures to pay and the reasons and promises she had provided, LB reached out separately to three senior noncommissioned officers in the unit for assistance. One of the three, Master Sergeant (MSgt) MC, who once supervised Appellant, testified that LB emailed her when she came back from maternity leave at "the end of June." In the email, LB described to MSgt MC the efforts he took to get repaid. MSgt MC opined that LB "just basically felt like he was getting a runaround." MSgt MC notified Appellant's current supervisor which led to a payment plan of five installments. LB received a $500.00 cash payment from Appellant at the beginning of July 2019, and Appellant made a second $500.00 payment on 17 July 2019 transferring the money to LB's credit union account from her credit union account. Appellant did not pay the remaining three installments, due in August and September 2019. The record of trial reveals little about the interactions between LB and Appellant on the payment of the remaining three installments. The court members convicted Appellant of dishonorable failure to pay the $2,550.00 debt from between on or about 30 March 2019 to on or about 31 October 2019.

Appellant was also convicted, contrary to her pleas, of three specifications—larceny, wrongful appropriation, and obstruction of justice—related to cash ATM withdrawals made using a squadron booster club debit card and then presenting a falsified document which purported to show that the cash from one of the ATM withdrawals was given as a deposit to a business for booster club t-shirts. At the time of these offenses, Appellant was the squadron booster club's vice-president. The booster club was a private organization on Andersen AFB.

The larceny specification involved three ATM withdrawals made by Appellant from late April to early May 2019 using the booster club's debit card which resulted in Appellant being convicted of stealing money, of a value less than $1,000.00, from two financial institutions. Appellant admitted making the first of the three ATM withdrawals, about $300.00, but claimed she used money from this withdrawal to place a deposit on t-shirts for the booster club after the card reader at the one business did not work with the debit card. When the booster club treasurer asked about this expenditure, Appellant first claimed that she had used one company for the t-shirts, then later stated she had used a different company. When the booster club treasurer asked for a receipt, Appellant provided various excuses for why she could not provide one. Eventually, Appellant produced a fake receipt for the t-shirts, which we describe in further detail with the obstruction of justice specification.

Regarding the second and third ATM withdrawals for the larceny specification, Appellant suggested that the debit card may have been hacked and offered that her debit card had been hacked at one of the same off-base ATMs. However, in a group text message on 7 May 2019 to the other members of the booster club council, Appellant stated she checked "the bank account last week" and Appellant said nothing about any unauthorized transactions. When questioned by investigators in September 2019, after waiving her rights under Article 31, UCMJ, 10 U.S.C. § 831, Appellant claimed she did not remember whether she made the second and third ATM withdrawals.

The wrongful appropriation specification involved a fourth ATM withdrawal at one of the financial institutions. Appellant also admitted making this withdrawal, about $400.00, but claimed it was used to reserve a hotel's banquet space for the squadron's holiday party. In discussing this expenditure with the booster club treasurer, Appellant first claimed that she had placed the deposit at one hotel, then later claimed it was a different hotel that was nearby. When the booster club event coordinator followed up with the two hotels, neither had a record of receiving a deposit from the booster club. At trial, the banquet manager from one of the hotels explained that he spoke on the phone with Appellant two or three times about a possible reservation, but none was made as the booster club had not yet agreed upon a date for their event. The banquet manager explained that a minimum deposit of $500.00, not $400.00, was required to reserve their venue and that no reservation or deposit was made. On 3 July 2019, Appellant submitted her resignation as booster club vice-president and returned $400.00 in cash to the booster club president, a fellow staff sergeant. The returned money was supposedly a refund of the deposit Appellant made to the hotel. The booster club president did not remember Appellant providing a receipt from the hotel showing the refund.

When Appellant resigned from the booster club, she did provide one receipt

to the booster club president which purported to show a $267.00 deposit had been made for the t-shirt purchase. This receipt was an obvious fake and led to Appellant's conviction for obstruction of justice for providing a false document. By the time she provided this receipt, Appellant already knew the booster club treasurer filed a security forces report regarding the ATM withdrawals. Appellant also received multiple requests from the booster club treasurer for the receipts showing what Appellant had done with the cash from the two ATM withdrawals Appellant admitted making. In order to make the fake receipt, Appellant sought and received a quote for t-shirts on 2 July 2019 from a t-shirt company and then altered it to appear as if she made a $267.00 deposit in May of 2019. The submitted receipt did not withstand scrutiny for two main reasons: (1) once the deposit amount was added to the receipt, the math on the rest of the receipt was incorrect; and (2) the t-shirt company used a second form to document deposits received and this second form—which was always handwritten and would bear a "paid stamp" if a deposit was received—did not exist for this quote.

Appellant was also convicted, contrary to her pleas, of the lesser-included offense of wrongful appropriation of overseas housing allowance (OHA) of a value greater than $1,000.00, military property of the United States. Appellant began receiving OHA in 2017 when she lived off-base and kept receiving it even after she received her on-base housing assignment, effective 2 May 2019. A representative of the housing office prepared an on-base housing assignment letter for Appellant and an Air Force (AF) Form 594 which was to be used to stop Appellant's entitlement to OHA. Appellant came into the housing office and signed both documents. Appellant was instructed to hand carry the AF Form 594 to the finance office to stop her OHA, but Appellant failed to do so which resulted in her being paid approximately $3,370.00 per month, tax-free, for more than six months while she lived on-base. A representative from the finance office testified that she searched their systems and sign-in logs before concluding that Appellant never visited the finance office during the charged timeframe to stop her OHA.

## II. DISCUSSION

### A. Motion to Suppress

#### 1. Additional Background

Prior to trial, Appellant filed a motion to suppress statements she made on the telephone on 7 June 2019 to the booster club treasurer and booster club event coordinator regarding the ATM withdrawals. In Appellant's view, the booster club treasurer, an Air Force staff sergeant from her squadron, was required to provide Appellant an Article 31, UCMJ, rights advisement prior to questioning.

After hearing testimony from witnesses and argument on the motion, the military judge issued an oral ruling on the record. The oral ruling was supplemented in writing after trial adjourned. The military judge concluded the booster club treasurer was not required to provide an Article 31 rights advisement to Appellant because the treasurer was not acting in an official law enforcement or disciplinary capacity and could not reasonably be considered as acting in such a capacity. The military judge found the treasurer was concerned she would be held personally responsible for any unaccounted funds and concluded her motivation for asking questions and seeking receipts from Appellant was "primarily based on her role as treasurer." The military judge determined the treasurer was not directed to conduct any investigations or interrogations by law enforcement or her leadership and she took her concerns to security forces so an investigation could be conducted. The military judge determined Appellant's statements to the treasurer were voluntary and he noted the two were of equal grade, the treasurer was not Appellant's supervisor, and was not superior to Appellant in the chain of command.

Relevant to this assignment of error, Appellant also moved to suppress derivative evidence obtained after the phone conversation including (1) an undated memorandum for record Appellant provided to the acting first sergeant about the missing booster club funds;[4] (2) an email Appellant provided to the acting first sergeant or another senior noncommissioned officer that purported to show Appellant made a $400.00 deposit to a hotel for the squadron holiday party; and (3) statements Appellant made to security forces investigators in September 2019 after waiving her Article 31 rights.[5]

The military judge suppressed the first two items. Regarding the memorandum for record to the acting first sergeant, the military judge concluded the Government had not established it was voluntarily provided by Appellant. The military judge determined the acting first sergeant should have reasonably believed Appellant committed an offense as he was briefed by the booster club treasurer that Appellant appeared to bear some responsibility for the missing funds. As the acting first sergeant was not a member of the booster club coun-

---

[4] Other booster club council members were also directed to provide a similar memorandum or email to the acting first sergeant. According to the booster club treasurer, the acting first sergeant indicated there would be "paperwork" for "anybody who didn't turn in information."

[5] At trial, Appellant also moved to suppress statements Appellant made to the booster club president about the missing funds and the receipt for the purported t-shirts deposit. The military judge admitted the testimony of the booster club president regarding the falsified t-shirt receipt and the receipt itself. Appellant does not challenge these parts of the military judge's ruling on appeal.

cil, the military judge determined the Prosecution had not overcome the presumption the memorandum was for disciplinary purposes. Regarding the email purporting to show the hotel deposit, the military judge found it was derivative of the memorandum for record and was not voluntarily provided by Appellant.

The military judge denied the motion to suppress the third item, Appellant's statements to security forces investigators after rights advisement. The military judge concluded Appellant made the statements voluntarily, Appellant was advised of her rights prior to questioning, understood her rights, and agreed to answer questions. The military judge noted that investigators did not provide Appellant a cleansing statement related to the suppressed memorandum for record Appellant provided to her acting first sergeant, but noted that approximately two months had passed since the memorandum was provided and the investigators did not use the suppressed memorandum during their questioning.

### 2. Law

We review a military judge's ruling on a motion to suppress for an abuse of discretion. *United States v. Jones*, 73 M.J. 357, 360 (C.A.A.F. 2014) (citation omitted). "A military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." *United States v. Lewis*, 78 M.J. 447, 452 (C.A.A.F. 2019) (citation omitted). "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as that decision remains within that range." *Id.* (citations omitted).

"When there is a motion to suppress a statement on the ground that rights' warnings were not given, we review the military judge's findings of fact on a clearly-erroneous standard, and we review conclusions of law de novo." *Jones*, 73 M.J. at 360 (quoting *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000)). Whether a questioner was acting or could reasonably be considered to be acting in a law enforcement or disciplinary capacity is a question of law requiring de novo review. *Id.* at 361 (citations omitted).

Article 31, UCMJ, states in pertinent part:

> (b) No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.
>
> . . . .

(d) No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial.

"Thus, Article 31(b), UCMJ, [10 U.S.C. § 831(b),] warnings are required when (1) a person subject to the UCMJ, (2) interrogates or requests any statement, (3) from an accused or person suspected of an offense, and (4) the statements regard the offense of which the person questioned is accused or suspected." *Jones*, 73 M.J. at 361 (footnotes and citation omitted). However, the second of these prongs is met only if the questioner was acting in an official law enforcement or disciplinary capacity, or could reasonably be considered to be acting in such a capacity by a "reasonable person" in the suspect's position. *Id.* at 362. "Questioning by a military superior in the immediate chain of command 'will normally be presumed to be for disciplinary purposes,'" although such a presumption is not conclusive. *Swift*, 53 M.J. at 446 (quoting *United States v. Good*, 32 M.J. 105, 108 (C.M.A. 1991)) (additional citations omitted).

An "interrogation" includes "any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning." Mil. R. Evid. 305(b)(2). Mil. R. Evid. 304(a) states "an involuntary statement from the accused, or any evidence derived therefrom, is inadmissible at trial" except as provided under two limited exceptions in Mil. R. Evid. 304(e). Mil. R. Evid. 304(a)(1)(A) defines "involuntary statement" as meaning "a statement obtained in violation of the self-incrimination privilege or Due Process Clause of the Fifth Amendment to the United States Constitution,[6] Article 31, or through the use of coercion, unlawful influence, or unlawful inducement."

The voluntariness of a confession is a question of law that is reviewed de novo. *Lewis*, 78 M.J. at 453 (citation omitted). "The prosecution bears the burden of establishing by a preponderance of the evidence that the confession was voluntary." *Id.* (quoting *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008)). "Voluntariness turns on whether an accused's 'will has been overborne.'" *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)).

> Where a confession is obtained at a lawful interrogation that comes after an earlier interrogation in which a confession was obtained due to *actual* coercion, duress, or inducement, the subsequent confession is presumptively tainted as the product of the earlier one. On the other hand, where the earlier confession was "involuntary" only because the suspect had not been properly

---

[6] U.S. CONST. amend. V.

> warned of his panoply of rights to silence and counsel, the vol-
> untariness of the second confession is determined by the totality
> of the circumstances.

*Id*. (quoting *United States v. Phillips*, 32 M.J. 76, 79 (C.M.A. 1991) (additional citation omitted)).

In reviewing whether an accused's will has been overborne, we assess "both the characteristics of the accused and the details of the interrogation." *Id*. (quoting *Freeman*, 65 M.J. at 453).

> Some of the factors taken into account have included the youth
> of the accused, [her] lack of education, or [her] low intelligence,
> the lack of any advice to the accused of [her] constitutional
> rights, the length of detention, the repeated and prolonged na-
> ture of the questioning, and the use of physical punishment such
> as the deprivation of food or sleep.

*Id*. Additional factors include (1) an earlier violation of Article 31(b), UCMJ; (2) whether the admission was made as a result of the questioner's using earlier, unlawful interrogations; and (3) the presence of a cleansing warning. *Id*. (citations and quotations omitted). The "absence of [a cleansing warning] is not fatal to a finding of voluntariness." *Id*. (citation omitted). "The fact that a suspect chooses to speak after being informed of [her] rights, is of course, highly probative." *Id*. (quoting *Oregon v. Elstad*, 470 U.S. 298, 318 (1985)).

### 3. Analysis

On appeal, as at trial, Appellant argues the booster club treasurer was acting in an official disciplinary capacity when she questioned Appellant on the telephone. Appellant claims the treasurer was acting at the direction of the acting first sergeant. In support of this claim, Appellant references a conversation the treasurer and acting first sergeant had before the treasurer called Appellant on the phone. The military judge addressed this conversation in his findings of fact. He found that the treasurer "expressed her concerns and sought advice on the next step" from the acting first sergeant who "suggested that she speak with those members of the [b]ooster [c]lub council who were not on leave or TDY, but if [those] funds remained unaccounted for, they may need to refer the matter to [security forces investigators]."

The military judge's findings of fact are not clearly erroneous and are supported by the record, therefore we adopt them. Additionally, the military judge cited the correct law and applied it correctly. We find no abuse of discretion when the military judge determined the booster club treasurer was not acting or could not reasonably be considered as acting in an official law enforcement or disciplinary capacity. We considered the facts and circumstances at the time

of the phone call which Appellant cited in her brief and none of them demonstrate that the military judge's findings of fact are clearly erroneous or that the law was misapplied. The military judge did not abuse his decision in determining the booster club treasurer was not required to advise Appellant of her Article 31(b) rights prior to asking her questions on the phone.

Appellant also asserts her later statements to security forces should have been suppressed as a product of the earlier rights advisement violation by the booster club treasurer. This assertion is without merit as we have found no abuse of discretion in the determination that a rights advisement was not required by the booster club treasurer and Appellant's statements on the phone were voluntary. Additionally, we note the military judge's ruling admitting Appellant's statements to security forces does not contain clearly erroneous findings of facts, incorrect statements of law, or incorrect applications of that law. We see no abuse of discretion when the military judge concluded Appellant's statements to security forces were admissible and voluntary, even though the acting first sergeant committed an Article 31(b) rights violation two months prior to Appellant waiving her Article 31 rights and agreeing to answer the questions of investigators.

## B. Legal and Factual Sufficiency

Appellant asserts the larceny and wrongful appropriation convictions for the ATM withdrawals[7] are legally and factually insufficient because (1) there is insufficient evidence Appellant did not have authorization to use the debit card for purchases; and (2) because Appellant was authorized to use the debit card, the booster club should have been the named victim, not the financial institutions.

For the dishonorable failure to pay a just debt conviction related to the loan from LB, Appellant asserts it is legally and factually insufficient because (1) the Government did not prove the element that the debt to LB was due and payable on or about 30 March 2019; (2) there was no evidence Appellant had the means to pay the debt; and (3) the Government failed to prove the terminal element that, under the circumstances, Appellant's conduct was to the prejudice of good order and discipline in the armed forces.

The Government disagrees and argues each of the convictions is legally and factually sufficient. We agree with the Government, except we narrow the timeframe for the dishonorable failure to pay a just debt specification to ac-

---

[7] Appellant does not challenge the legal or factual sufficiency of her wrongful appropriation conviction for OHA or her obstruction of justice conviction by presenting a falsified document in the form of the t-shirt deposit receipt.

count for the payment plan agreement that Appellant and LB entered into after the debt became due and payable and the two payments Appellant made under that payment plan.

**1. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

For the larceny specification, a violation of Article 121, UCMJ, the Government had to prove beyond a reasonable doubt: (1) at the time and place alleged, Appellant wrongfully took, obtained, or withheld money from the possession of the owner; (2) that the property belonged to the Bank of Guam and the Pentagon Federal Credit Union; (3) that the property value was less than $1,000.00; and (4) that the taking, obtaining, or withholding by Appellant was with the intent permanently to deprive or defraud another person of the use of the property or permanently to appropriate the property for the use of Appellant or for any person other than the owner. *See Manual for Courts-Martial, United*

*States* (2019 ed.) (*MCM*), pt. IV, ¶ 64.b.(1). The term "'[o]wner' refers to the person who, at the time of the taking, obtaining, or withholding, had the superior right to possession of the property in light of all conflicting interests therein which may be involved in the particular case." *MCM*, pt. IV, ¶ 64.c.(1)(c)(ii).

For the wrongful appropriation specification, also a violation of Article 121, UCMJ, the Government had to prove beyond a reasonable doubt: (1) at the time and place alleged, Appellant wrongfully took, obtained, or withheld money from the possession of the owner; (2) that the property belonged to the Pentagon Federal Credit Union; (3) that the property value was less than $1,000.00; and (4) that the taking, obtaining, or withholding by Appellant was with the intent temporarily to deprive or defraud another person of the use and benefit of the property or temporarily to appropriate the property for the use of Appellant or for any person other than the owner. *See MCM*, pt. IV, ¶ 64.b.(2).

For the dishonorable failure to pay a just debt specification, a violation of Article 134, UCMJ, the Government had to prove beyond a reasonable doubt: (1) between on or about 30 March 2019 to on or about 31 October 2019, within the territory of Guam, Appellant was indebted to LB in a certain sum, $2,550.00; (2) that this debt became due and payable on or about a certain date, 30 March 2019; (3) that while the debt was still due and payable Appellant dishonorably failed to pay this debt; and (4) that under the circumstances, the conduct of Appellant was to the prejudice of good order and discipline in the armed forces. *See MCM*, pt. IV, ¶ 96.b. "More than negligence in nonpayment is necessary. The failure to pay must be characterized by deceit, evasion, false promises, or other distinctly culpable circumstances indicating a deliberate nonpayment or grossly indifferent attitude towards one's just obligations." *MCM*, pt. IV, ¶ 96.c. "To the prejudice of good order and discipline refers only to acts directly prejudicial to good order and discipline and not to acts which are prejudicial only in a remote or indirect sense." *MCM*, pt. IV, ¶ 91.c.(2)(a). This element is met in "cases in which the prejudice is direct and palpable." *See MCM*, pt. IV, ¶ 91.c.(2)(a).

### 2. Analysis

#### a. Larceny and Wrongful Appropriation – ATM Withdrawals

Appellant's first argument is that there was insufficient evidence to show she lacked authorization to use the booster club's debit card. Appellant asserts

that the booster club had "no established bylaws"[8] which required booster club council approval of expenditures under $500.00. We are not persuaded. Regarding the bylaws, the booster club treasurer agreed that the bylaws were being "updated" and that in May 2019 they had "all signed them and sent them to the private org[anization] monitor" but they "had not received them back." Even if the bylaws had expired or were pending approval, we do not see this status, by itself, as providing Appellant authorization to make ATM withdrawals just because she possessed the debit card. The booster club treasurer testified to the procedures used for expenditures under $500.00 as "we as a council, together can make that determination." The booster club president testified approving purchases was normally done through text message or at a meeting and that for expenditures between $200.00 and $500.00, "[W]e have to approve it through us, just the council." Appellant never indicated to any council member that she needed to or planned to use the debit card. Appellant also did not notify any council member that she used the debit card at an ATM until questioned by the booster club treasurer about the missing funds. There was sufficient evidence presented for a rational factfinder to conclude that Appellant did not have actual or apparent authority to make the ATM withdrawals.

Appellant's next argument is that even if council approval was required for the withdrawals, the booster club secretary "made a purchase during the time period he was in possession of the card, and he did so without prior approval of any council member." We are not persuaded. The booster club secretary used donated gift cards from the commissary to purchase hot dogs, buns, and condiments for a booster club event on 13 April 2019. The booster club secretary denied making any purchases with the debit card during the time he possessed it. We see little similarity between the use of donated gift cards for food items for an actual booster club event and the ATM withdrawals Appellant made. Further, even if the booster club secretary was required to get council approval before using the gift cards and failed to do so, this would not have provided Appellant authorization to use the debit card at ATMs.

Appellant's third and final assertion is that the booster club should have been the named victim, rather than the financial institutions, because Appellant was authorized to use the debit card. As a threshold matter, Appellant's argument fails because we have concluded there was sufficient evidence presented establishing she was not authorized to use the debit card. However, assuming *arguendo* that Appellant had some apparent authority to use the

---

[8] No bylaws were admitted into evidence at trial. A copy of approved bylaws are in the record of trial attached to Government's response to a motion, Appellate Exhibit IV, however the Government conceded in its motion that the electronic signature date on the bylaws is illegible.

booster club debit card, we still conclude the specifications are legally sufficient as charged.

Appellant compares her situation to the appellant in *United States v. Lubasky* who used an elderly woman's debit card for ATM withdrawals and for other debit transactions. 68 M.J. 260, 262 (C.A.A.F. 2010). *Lubasky* had "limited and specific authority" from the woman to "access her bank account" and his status on the account was "joint ownership." *Id.* The Government charged these transactions as larceny from the elderly woman. The United States Court of Appeals for the Armed Forces (CAAF) first acknowledged that "ATM withdrawals are '*usually* a larceny of money from the entity presenting the money' and debit card transactions are '*usually* a larceny of goods from the merchant offering them.'" *Id.* at 263–64 (quoting *Manual for Courts-Martial, United States* (2002 ed.), pt. IV, ¶ 46.c.(1)(h)(iv)). However, the CAAF found that charging the ATM withdrawals as larceny from the woman was legally sufficient under an "alternative charging theory" based on "the particular facts of this case." *Id.* at 264. As we see it, just because there was an "alternative charging theory" available in *Lubasky* does not mean the Government was *required* to charge a similar alternative theory in this case.

In *United States v. Williams,* the CAAF again stated that "'[a]lternative charging theories are also available,' as long as 'the accused wrongfully obtained the goods or money' from someone 'with a superior possessory interest.'" 75 M.J. 129, 132 (C.A.A.F. 2016) (quoting *Manual for Courts-Martial, United States* (2012 ed.), *Drafters' Analysis*, App. 23, at A23-17). However the CAAF explained "alternative theories are the exception, and not . . . the rule." *Id.* Earlier this year, the CAAF held in *United States v. Castro* that "it was proper for the specification to identify the GSA as the victim of the larceny because its fuel was stolen" as the GSA "was an entity from whom the appellant wrongfully obtained the goods." 81 M.J. 209, 212–13 (C.A.A.F. 2021) (citation omitted). Here, the financial institutions were the entities from whom Appellant received the money when she made the ATM withdrawals. We conclude the financial institutions had a superior possessory interest in the money. Appellant was not a joint holder of the booster club account and her authority to make ATM withdrawals for her personal benefit was non-existent.

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," we find the evidence was legally sufficient to support Appellant's convictions of larceny and wrongful appropriation beyond a reasonable doubt. *Barner*, 56 M.J. at 134 (citations omitted). Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the court members did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325.

Appellant's convictions for larceny and wrongful appropriation are both legally and factually sufficient.[9]

### b. Dishonorable Failure to Pay Just Debt – Loan from LB

Appellant raises four arguments in challenging the evidence of the dishonorable failure to pay the debt to LB. The first argument is that the Government did not prove the element that the debt to LB was due and payable on or about 30 March 2019. This assertion is without merit. The Government admitted into evidence the signed promissory note which unquestionably showed the debt was to be paid "in full by 30 March 2019."

Appellant's second argument is that the repayment date shifted into multiple due dates when a payment plan was established. Appellant is correct that a payment plan was established and it is true that two on-time payments were made under the payment plan. Both of these facts impact the first element, whether during the charged timeframe Appellant was indebted to LB in a certain sum, $2,550.00. However, the payment plan and two payments do not render the specification legally and factually insufficient if the Government proved the essential elements of the offense beyond a reasonable doubt for the time period prior to the payment plan. We find sufficient evidence was presented that Appellant committed the charged offense during the time when the $2,550.00 debt was due and payable in full, but we modify in our decretal paragraph the end date of the specification to on or about 30 June 2019, to account for the payment plan agreement and Appellant's payments in July 2019.

Appellant's third argument is that there was no evidence that Appellant had the means to pay the debt. Appellant cites *United States v. Hilton*, which determined that "financial inability . . . is a fact to be considered with others in determining whether such a failure was dishonorable." 39 M.J. 97, 100 (C.M.A. 1994) (citation omitted). The court members certainly received evidence of Appellant's financial problems during findings, but trial defense counsel's findings argument did not attempt to argue this evidence demonstrated

---

[9] We note that Article 121a(a)(3), UCMJ, 10 U.S.C. § 921a(a)(3), took effect on 1 January 2019 and includes an offense for when an accused knowingly uses a credit card, debit card, or other access device without the authorization of a person whose authorization is required for such use; to obtain money, property, services, or anything else of value. We note the *MCM* provisions on larceny and wrongful appropriation include the following provision, "Wrongfully engaging in a credit, debit, or electronic transaction to obtain goods or money *ordinarily* should be charged under paragraph 65" which covers Article 121a, UCMJ. *See MCM*, Pt. IV, ¶ 64.c.(1)(i)(v) (emphasis added). Appellant has raised no allegation of error from the Government's decision to charge her under Article 121, UCMJ, instead of Article 121a, UCMJ, and we find none.

Appellant had a financial inability to pay LB. Instead the argument on this specification was:

> [A]ll I'm going to talk about . . . [is] the impact of good order and discipline because [Appellant] did a bad job of this. She borrowed money. She's already in debt. She's doing a bad job of managing her finances. And I think you can see throughout this case that one thing is true that [D]efense would agree with, that [G]overnment would agree with, [Appellant] is not good with money. She made some bad decisions and not managing it well, and that's just a fact. So she needs to borrow money from [LB] and she's bad about paying him back and she's not responsive with it and not doing [it in] a timely manner, but consider the ultimate impact.

Trial defense counsel then argued that the Government had not proven the terminal element that Appellant's failure to pay was prejudicial to good order and discipline.

We can understand why trial defense counsel did not raise inability to pay as a critical fact for the court members to evaluate on whether the failure to pay was dishonorable. A member of the finance office testified in Appellant's trial describing Appellant's entitlements, including the amounts of her base pay, OHA, and basic allowance for subsistence (BAS). These entitlements, received monthly, greatly exceeded the debt Appellant owed to LB. Further, as Appellant continued to receive OHA after accepting her on-base house on 2 May 2019, she had additional funds available to her, particularly in June of 2019, that she did not use to pay the debt to LB. Appellant references her statements to security forces investigators in September 2019 that she was also indebted to her father as further justification for her inability to pay. However, there was no evidence of the amount of Appellant's debt to her father, when it was payable, or that it caused an inability to pay LB between 30 March 2019 and 30 June 2019. After considering the evidence presented at trial, we are not persuaded that Appellant had an inability to pay LB during the modified charged timeframe.

Appellant's fourth and final assertion, which was also argued at trial, is that the Government failed to prove the terminal element that under the circumstances Appellant's conduct was to the prejudice of good order and discipline in the armed forces. Appellant asserts there was "little, if any, mission impact." Appellant argues the debt "apparently only came to light when investigators stumbled on the information during their interview [of Appellant] regarding other financial missteps." The Government argues the terminal element was proven and cites LB's testimony and the testimony of MSgt MC that failure to pay resulted in time taken away from the unit, as a well as a decrease

in trust within the unit. The Government argues that when Appellant borrowed money from a co-worker and then failed to pay, in the manner she did, her actions had a direct impact on unit morale, cohesion, and trust. We find the Government presented sufficient evidence to prove the terminal element beyond a reasonable doubt, even within the narrowed timeframe of the specification.

The messages Appellant and LB exchanged demonstrate both Appellant's evasiveness and LB's repeated follow-ups during the April and May 2019 timeframe. During this time period, LB and Appellant were in the same squadron and worked in the same building, but in different sections of the building. In June 2019, LB reached out to MSgt MC and two other senior noncommissioned officers about Appellant's debt. LB estimated he spent more than ten hours between April and June 2019 going back and forth with Appellant on this debt. LB also testified that his interactions with Appellant over this debt impacted his ability to trust her and that she lied to him and kept providing him empty promises. LB conceded that no Air Force mission failed due to Appellant's actions. For her part, MSgt MC, explained that her knowledge of this incident "added to the distrust" she had of Appellant.

We are satisfied the Government proved beyond a reasonable doubt that Appellant's actions directly prejudiced good order and discipline in a palpable manner during the narrowed timeframe of between on or about 30 March 2019 to on or about 30 June 2019. Multiple senior noncommissioned officers were drawn in to assist LB in his efforts to obtain repayment. LB's efforts were extensive. Appellant's deceit and evasion towards a fellow Air Force member in her unit was corrosive to unit cohesion and led to LB distrusting Appellant. LB's distrust of Appellant from this failure to pay was also shared by MSgt MC who distrusted Appellant even further after being involved with resolving this incident. Taken together, there was ample evidence Appellant's dishonorable failure to pay this debt directly prejudiced good order and discipline in the armed forces.

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," we find the evidence was legally sufficient to support Appellant's convictions of dishonorable failure to pay a just debt to LB from between on or about 30 March 2019 to on or about 30 June 2019, beyond a reasonable doubt. *Barner*, 56 M.J. at 134 (citations omitted). Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the court members did, we are convinced of Appellant's guilt to the narrowed timeframe of between on or about 30 March 2019 to on or about 30 June 2019, beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction for dishonorable failure to pay a just debt to LB, as modified, is both legally and factually sufficient

**C. Admission of "Transcript" of Messages**

**1. Additional Background**

The military judge admitted three prosecution exhibits of messages that Appellant exchanged with others using the messaging application, WhatsApp®. Two of the exhibits were screenshots of the messages and drew no objection from trial defense counsel. The third exhibit, Prosecution Exhibit 11, the messages exchanged between Appellant and LB, was created by LB when he "exported it from [his] WhatsApp archive." Trial defense counsel objected as to foundation and argued that Prosecution Exhibit 11 was a transcript—a term both LB and trial counsel used to describe the exhibit—and should be evaluated under the four steps of *United States v. Craig*, 60 M.J. 156 (C.A.A.F. 2004).[10] Trial defense counsel proffered that he never saw the underlying messages so it was impossible to compare the exhibit to the messages for accuracy. The military judge overruled the objection to foundation and admitted the exhibit. He found *Craig* distinguishable as it dealt with a transcription of audio recordings. The military judge described Prosecution Exhibit 11 as "no different than an email exchange being kept in archive."[11]

Before us, Appellant asserts the military judge abused his discretion by admitting Prosecution Exhibit 11 and the error was not harmless. Appellant acknowledges that *Craig* involved transcripts of audio recordings but argues "the same principles apply" to the messages with LB and the "procedural protections were not followed." Appellant argues the admission of the messages was prejudicial as they contained LB's attempts to collect the money and were used to convict Appellant of dishonorable failure to pay a just debt.

The Government argues that *Craig* does not apply as the messages are not a typewritten record of an audio communication. The Government argues we

---

[10] The four steps are:

> (1) the trial judge should review[ ] the transcript for accuracy; (2) the defense counsel should be allowed to highlight alleged inaccuracies and to introduce alternative versions; (3) the jury should be instructed that the tape, rather than the transcript, was evidence; and (4) the jury should be allowed to compare the transcript to the tape and hear counsel's arguments as to the meaning of the conversations.

*Craig*, 60 M.J. at 161 (alteration in original) (internal quotation marks and citation omitted).

[11] Trial defense counsel also objected that the messages from LB to Appellant were hearsay. The military judge overruled the hearsay objection and later instructed the members that LB's statements could only be considered for the effect they had on Appellant.

should consider the messages "more properly analogized to a Cellebrite extraction" from a cellphone. The Government argues cellphone extractions are admitted into evidence if properly authenticated under Mil. R. Evid. 901 and that LB properly authenticated the messages during his testimony. Finally, the Government notes that if Appellant wanted discovery access to LB's phone to view the original messages and compare them to the exhibit, he failed to present any evidence that he requested such access in discovery.

### 2. Law and Analysis

We review a military judge's decision to admit evidence for an abuse of discretion. *United States v. Finch*, 79 M.J. 389, 394 (C.A.A.F. 2020) (citation omitted). We have already described the law on when a military judge abuses his discretion in this opinion.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Mil. R. Evid. 901(a). Mil. R. Evid. 901(b)(1) states that one example of evidence that satisfies this requirement is testimony of a witness with knowledge that an item is what it is claimed to be.

We see no abuse of discretion by the military judge in admitting Prosecution Exhibit 11. While LB referred to the exhibit as a "transcript" and trial counsel then repeated this word in a later question to LB when laying the foundation for the exhibit's admission, the export of the messages was not a transcription of an audio or video recording where *Craig* would apply. We find the proponent of the exhibit, the Government, produced evidence in the form of LB's testimony that the messages on the exhibit were the ones that LB and Appellant exchanged, with redactions. Trial defense counsel received the unredacted messages as well and was able to compare what redactions were made. These are the only procedural requirements that were necessary for the Government to satisfy before the military judge admitted the exhibit.

As far as trial defense counsel's professed inability to compare the exhibit to the original messages, we agree with the Government that the Defense could have requested access to LB's phone in discovery, and if denied, filed a motion to compel with the military judge. As we find no abuse of discretion by the military judge in admitting the exhibit, we do not reach the question of whether the alleged error was harmless.

## III. CONCLUSION

Specification 2 of Charge III is modified by striking "31 October 2019" and

substituting therefor "30 June 2019."[12] The findings, as modified, and sentence entered are correct in law and fact, and no error materially prejudicial to Appellant's substantial rights occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings, as modified, and sentence are **AF-FIRMED**.[13]

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[12] The specification should read "In that STAFF SERGEANT CONSTANCE S. VAUGHN, United States Air Force, 36th Civil Engineer Squadron, Andersen Air Force Base, Guam, being indebted to [LB] in the sum of $2,550.00 for a loan, which amount became due and payable on or about 30 March 2019, did, within or near the Territory of Guam, from on or about 30 March 2019 to on or about 30 June 2019, dishonorably fail to pay said debt, and that said conduct was to the prejudice of good order and discipline in the armed forces." We direct the final order prepared under R.C.M. 1209(b) and Department of the Air Force Instruction 51-201, *Administration of Military Justice*, Section 14J (18 Jan. 2019) reflect this action taken on appeal.

[13] We note the Statement of Trial Results failed to include the command that convened this court-martial as required by R.C.M. 1101(a)(3). Appellant has not claimed prejudice, and we find none. *See United States v. Moody-Neukom*, No. ACM S32594, 2019 CCA LEXIS 521, at *2–3 (A.F. Ct. Crim. App. 16 Dec. 2019) (unpub. op.) (per curiam).